[No. B155019. Second Dist., Div. Two. June 9, 2005.]

WATSON LAND COMPANY, Plaintiff and Appellant, v.
SHELL OIL COMPANY, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 976(d) and 976.1, this opinion is certified for partial publication. The portions directed to be published are the Introduction, Facts, part 4 of Shell's Appeal, and the Disposition.

**COUNSEL**

Bright and Brown, James S. Bright, Maureen J. Bright and Brian L. Becker for Plaintiff and Appellant.

Caldwell, Leslie, Newcombe & Pettit, Michael R. Leslie, Mary Newcombe, Cara A. Horowitz, Andrew Esbenshade, Sandra L. Tholen; Greines, Martin, Stein & Richland and Feris M. Greenberger for Defendant and Appellant.

Mayer, Brown, Rowe & Maw and Gregory R. McClintock for Western States Petroleum Association as Amicus Curiae on behalf of Defendant and Appellant.

**OPINION**

**ASHMANN-GERST, J.—**

### INTRODUCTION

When respondent Watson Land Company (Watson) discovered groundwater and soil contamination under its land (the Watson Center), it claimed that appellant Shell Oil Company (Shell), among others, was responsible. A jury awarded Watson $3,915,851 for the cost of cleanup of contamination caused by the leakage of leaded gasoline from pipelines Shell was operating under

the Watson Center. Additionally, the jury found that Shell derived a $14,275,237 benefit when it failed to clean up the contamination and awarded that amount to Watson pursuant to Civil Code section 3334. Shell appeals and urges reversal on the following grounds: (1) Because Atlantic Richfield Company (ARCO) settled with Watson and agreed to pay for the entire clean-up of the Watson Center, ARCO was the real party in interest and Watson lacked standing to sue; (2) at a minimum, ARCO should have been joined as a coplaintiff at trial as an indispensable party; (3) Watson's evidence of causation was based on inadmissible evidence; and (4) the 1992 amendment to Civil Code section 3334 allowing a plaintiff to recover the benefits obtained by a trespasser should not have been applied because Shell was not benefited when its pipelines leaked. Therefore, even if there was causation, the judgment must be reduced by $14,275,237.

Watson challenges two orders on cross-appeal. According to Watson: (1) the trial court improperly denied a motion for sanctions against Shell for bad faith conduct under Code of Civil Procedure section 128.7,[1] and (2) the trial court erroneously gave Shell a credit for the litigation costs ARCO agreed to pay Watson through settlement and then reduced Watson's recoverable costs by half.

In part 4 of Shell's appeal, we hold that for the purposes of Civil Code section 3334, Shell did not obtain any benefits when its pipelines leaked onto the Watson Center. As a consequence, the judgment in favor of Watson must be reduced by $14,275,237. In the unpublished portion of this opinion, we explain that Watson's cross-appeal, and the rest of Shell's appeal lack merit. As modified, the judgment is affirmed in all other respects.

## FACTS

The Watson Center is a fully developed commercial and industrial park with over 50 lots, most of which have been improved with buildings. Watson leases those buildings to various tenants. ARCO owns a refinery (the ARCO Refinery) across the street from the Watson Center and uses it for processing, storing and transporting crude oil, gas and petroleum products. There are two major pipeline corridors that run under the Watson Center. The first is commonly referred to as the "Utility Way Pipeline Corridor,"[2] and the second

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

[2] The Utility Way Pipeline Corridor is a portion of the Watson Center that is subject to a pipeline easement held by Shell.

is commonly referred to as the "DWP Pipeline Corridor."[3] At times relevant to this appeal, Shell operated pipelines in both of those corridors.

In 1996, Watson sued, inter alia, Shell and ARCO pursuant to 11 causes of action, including trespass and nuisance. The first amended complaint alleged: Since some time prior to 1977, the operations of ARCO contaminated the groundwater beneath the ARCO Refinery. ARCO has been actively recovering free-floating petroleum product and removing contamination from the groundwater beneath the ARCO Refinery. In 1985, ARCO began conducting its remediation efforts under order of the Los Angeles Regional Water Quality Control Board (RWQCB). The RWQCB directed ARCO to create a subsurface barrier to prevent the migration of groundwater contamination to the Watson Center. Based on ARCO's remediation efforts and its representations, Watson believed that the contamination had not migrated to the Watson Center. However, in 1995, a prospective tenant at the Watson Center conducted an environmental site investigation and discovered contamination. In 1996, Watson engaged an independent environmental consulting firm to investigate the contamination and its sources. The ARCO Refinery and three other offsite properties were found to be likely contributors to the groundwater contamination. As well, Watson learned that the Shell pipelines running beneath the Watson Center may also be contributors.

Watson and ARCO entered in a settlement agreement (the settlement agreement) with an effective date of November 1, 2000. The settlement agreement provided that Watson would continue to diligently pursue its claims against the other defendants in the case and deposit the proceeds into a cleanup fund (the cleanup fund). ARCO agreed to be responsible for the remediation of the Watson Center, subject to a specified right of reimbursement from the cleanup fund. The parties divided the Watson Center into three areas: Area A, Area B and Area C. Pursuant to the parties' agreement, ARCO was entitled to 100 percent reimbursement of cleanup expenses related to Area A, 90 percent related to Area B, and 5 percent related to Area C.

The trial court granted ARCO's motion for determination of good faith settlement with Watson. The order specified that none of the nonsettling defendants was entitled to any set-off or credit as a result of the settlement between ARCO and Watson, that Watson would seek to "recover from the remaining defendants only their proportionate shares of liability for contamination of [the Center]," and the trial court would retain jurisdiction over the cleanup fund.

---

[3] The DWP Pipeline Corridor is property owned by the Los Angeles Department of Water and Power. The corridor cuts through the Watson Center.

Prior to trial, Shell moved to exclude evidence of remediation costs on the theory that they would be paid by ARCO and ARCO was the real party in interest. In the alternative, Shell argued that ARCO had to be joined as an indispensable party. Shell's motion was denied.

At trial, Watson expert Jeffrey Dagdigian (Dagdigian) explained that when enough gasoline contaminates soil, the gasoline will float on top of the groundwater and become a source of contamination. The gasoline slowly dissolves into the groundwater, becomes a plume, and moves in the direction of the groundwater flow. The contamination is most concentrated at the source. Then, following the second law of thermodynamics, the contamination moves from a concentrated state to a random, dissolved state.

Watson produced maps displaying three plumes of gasoline contamination: Plume A (a medium sized plume at the northern end of the Watson Center over the Utility Way Pipeline Corridor), Plume B1 (a small plume in the southern half of the Watson Center over the DWP Pipeline Corridor at 233rd Street), and Plume B2 (a large plume in the southern half of the Watson Center over the Utility Way Pipeline Corridor at 233rd Street).[4] Dagdigian testified that he was able to verify the accuracy of the plume maps by checking and rechecking facts and figures derived from unidentified "laboratory reports." He explained that overlapping concentrations of chemicals indicate a common source and then analyzed the plumes in terms of overlapping concentrations of benzene, diisipropyl ether (DIPE), methyl tertiary butyl ether (MTBE), and lead scavengers known as ethylene dichloride (EDC) and ethylene dibromibe (EDB).

According to the maps, Plume A contained concentrations of benzene, DIPE and EDC, Plume B2 contained concentrations of benzene, DIPE, EDC, and EDB, and Plume B1 contained concentrations of benzene, DIPE and MTBE. The absence of MTBE in Plume A and Plume B2 suggested to Dagdigian that the contamination in those plumes was a leaded gasoline. Further, the presence of DIPE suggested to Dagdigian, based on his research of Shell facilities, "that this gasoline came from one of those facilities."[5] He testified that Shell's pipelines carried the type of gasoline found in those plumes.

---

[4] In their briefs, the parties concentrate on Plume A and Plume B2. GATX Terminals Corporation, one of the defendants below, settled with Watson and agreed to remove jet fuel from the same area as Plume B1.

[5] A Shell chemist, Ileana Rhodes, testified that Shell manufactured DIPE at one of Shell's nearby refineries. Shell's quarterly reports to the Environmental Protection Agency in 1979 listed DIPE as an additive in Shell's gasoline. Rhodes acknowledged these reports. Dagdigian testified that DIPE was found at Shell facilities to the north and south of the Watson Center, and also at Morman Island, where Shell stored gasoline.

Dagdigian went on to explain that the gasoline in Plume B2 contained a mixed alkyl lead package comprised of: tetraethyl lead, methyltriethyl lead, dimethyldiethyl lead, trimethylethyl lead, and tetramethyl lead. In contrast, the only lead compound that was discovered under the ARCO Refinery was tetraethyl lead. When asked what that meant, he stated: "It means that the gasoline that was released underneath the ARCO Refinery is different than the gasoline that was released underneath the Watson Center."

Nancy Beresky (Beresky), another Watson expert, opined that the Plume B2 was caused when a Shell pipeline leaked leaded gasoline. She based her opinion on four lines of evidence. Shell transported leaded gasoline through the Utility Way Pipeline Corridor. There was no evidence that there were any other pipelines in that corridor that were used to carry the same type of material. The hot spot of the plume was centered immediately underneath the Utility Way Pipeline Corridor. Additionally, the plume was comprised of leaded gasoline that contained DIPE. The same material was found underneath the Shell refinery to the north and the one to the south. Those two refineries are interconnected via the Utility Way Pipeline Corridor.

According to Beresky, there was evidence that Plume B2 was not caused by contamination migrating from the ARCO Refinery. Points between Plume B2 and the ARCO Refinery revealed no detection of the chemicals found in Plume B2. Based on the second law of thermodynamics, it would be impossible to have high concentrations at Plume B2 and lesser concentrations between Plume B2 and the ARCO Refinery if the refinery was the source. Beresky explained that the hydrology of the area supported her position. She thought that if there was migration, "we would see some smearing in this area. We don't see that."

Continuing on to Plume A, Beresky stated that it was also caused by a leaded gasoline leak from a Shell pipeline in the Utility Way Pipeline Corridor. She based her opinion on several facts. The plume was elongated in a north and south direction and the hot spot was near the corridor. The contamination contained DIPE which, again, was the same material found at the local Shell facilities. According to Beresky, the contamination did not come from the ARCO Refinery because it was too far to migrate, and the material differed.

Charles Schmidt (Schmidt), a third Watson expert, testified regarding the results he obtained using "downhole flux" testing.[6] He testified that "the source of the B2 Plume is [the] Shell pipeline in [the] Utility Way [Pipeline]

---

[6] Downhole flux is measured by lowering a chamber into the ground and taking samples of the molecules of contaminants.

Corridor." He reached this conclusion because his tests showed a "top-down source" for the contamination that was above the groundwater. Further, he stated that he was able to exclude the ARCO Refinery as a source. Based on other data he collected, Schmidt opined that Plume A was created by a leak from Shell's pipeline. Subsequently, Dagdigian was asked about Schmidt's downhole flux data. Dagdigian noted that soil gas was first detected at 15 feet. He agreed, when asked by counsel, that this was evidence of a "top-down pipeline leak coming from the Utility Way Pipeline Corridor."

The jury found that Watson failed to prove a continuing nuisance, but that it did prove a continuing trespass. According to the jury, the amount Watson should receive for remediation was $3,915,851, and the value of the benefits obtained by Shell as a result of the gasoline contamination it caused at the Watson Center from June 1, 1993, to June 30, 2001, was $14,275,237.

The trial court entered judgment in favor of Watson in the amount of $18,191,088 and awarded $87,183.22 in costs. After the denial of various posttrial motions, these appeals followed.

Upon application, we allowed Western States Petroleum Association to file an amicus curiae brief regarding the proper interpretation of the "benefits obtained" measure of damages in Civil Code section 3334.

### SHELL'S APPEAL

1.–3.*

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

4. *The $14,275,237 in "benefits" damages must be reversed.*

The question presented is whether a gasoline leak from a pipeline constitutes "benefits" to Shell, as contemplated by Civil Code section 3334.

■ When interpreting a statute, we must "ascertain the intent of the Legislature so as to effectuate the purpose of the law." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386 [241 Cal.Rptr. 67, 743 P.2d 1323].) We must "look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. A construction making some words surplusage is to be avoided. The words of the statute must be construed in context, keeping in

---

*See footnote, *ante*, page 69.

mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible. [Citations.] Where uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation. [Citation.] Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent. [Citations.]" (*Id.* at pp. 1386–1387.) A close cousin of the foregoing quote is the rule " 'that the objective sought to be achieved by a statute as well as the evil to be prevented is of prime consideration in its interpretation.' [Citations.]" (*Wotton v. Bush* (1953) 41 Cal.2d 460, 467 [261 P.2d 256].)

Civil Code section 3334 reads: "(a) The detriment caused by the wrongful occupation of real property . . . is deemed to include the value of the use of the property for the time of that wrongful occupation, not exceeding five years next preceding the commencement of the action or proceeding to enforce the right to damages, the reasonable cost of repair or restoration of the property to its original condition, and the costs, if any, of recovering the possession. [¶] (b)(1) Except as provided in paragraph (2), for purposes of subdivision (a), the value of the use of the property shall be the greater of the reasonable rental value of that property or the benefits obtained by the person wrongfully occupying the property by reason of that wrongful occupation. [¶] (2) If a wrongful occupation of real property subject to this section is the result of a mistake of fact of the wrongful occupier, the value of the use of the property, for purposes of subdivision (a), shall be the reasonable rental value of the property."

 Shell's position is that though "benefits obtained" is not defined, "its plain meaning suggests that the provision acts as a disgorgement remedy forcing trespassers to give up wrongly obtained profits that accrue to the trespasser *as a direct result* of his or her wrongful *trespass*." In counterpoint, Watson contends that a benefit is obtained by any polluter who keeps money that it should have spent remediating the trespass. In our view, Shell is correct. "Benefits" are not "obtained" by reason of a wrongful occupation unless the trespass itself provided the trespasser with a financial or business advantage.

We start with the plain meaning of the statute. The word "benefits" connotes something that is advantageous, and the benefits contemplated by the statute must be obtained by reason of the wrongful occupation. In other words, a trespass must result in something advantageous for the trespasser or it does not qualify as a benefit for purposes of the statute. Here, the question is whether Shell's pipeline leakage and the resulting contamination of Watson's land can be considered something advantageous for Shell. We think

not. Not only did the gasoline leakage result in a loss of product for Shell, but it meant that pipelines either had to be repaired or abandoned and replaced by different pipelines at substantial cost.

■ We reject the notion that "benefits" include the avoidance of remediation costs. "The value of the use" is a separate component of damages from "the reasonable cost of repair or restoration of the property to its original condition." Remediation costs fall within the umbrella of the "reasonable cost of repair or restoration." If "benefits" included the cost of remediation (and the value of the use of the money saved, as Watson suggests), then the language permitting recovery of "the reasonable cost of repair or restoration" would be surplusage. (Civ. Code, § 3334, subd. (a).)

According to Watson, "[Civil Code] section 3334 was amended to eliminate the incentive to trespass, including as only one example defendants who dumped toxic waste on worthless desert properties to avoid the proper disposal costs. Obviously, those toxic dumpers did not generate a 'direct profit' dumping the waste—they simply avoided a cost thereby increasing their net profits. That is exactly what Shell did here. The value to Shell of the cleanup costs it never spent is many times the amount of the cleanup costs." This analogy fails. A polluter who dumps toxic waste in the desert instead of paying to properly dispose of toxic waste gains the financial advantage of getting either free disposal or cheaper disposal. No such financial advantage accrues to the owner of a leaking pipeline, at least insofar as the owner was not using the leak to effectuate disposal or to obtain some other financial gain separate from the failure to remediate the trespass.[16] In the absence of an advantage, there is no need to impose a special disincentive to trespass.

Our interpretation is in harmony with the salutary purpose of the 1992 amendment that introduced the "benefits obtained" measure of damages to Civil Code section 3334.

The origins of the amendment can be found in resolution No. 5-9-91, which was passed by the Conference of Delegates of the State Bar of California in the summer of 1991. In writing to the legislative counsel for the State Bar, the resolution's author explained that the resolution "provides a definition for the 'value of the use' which eliminates Section 3334's economic incentive to dump" toxic waste when the rental value is cheaper than the cost of disposal. "The 'value of the use' would be 'the greater of the reasonable rental value or the benefits obtained by the trespasser by reason of the trespass.' The measure of damages would take into account the benefit obtained by the trespass—the cost saved by not properly disposing the pollutants."

---

[16] Watson does not attribute any such intent to Shell.

Those connected to Assembly Bill No. 2663 (1991–1992 Reg. Sess.), the bill prompted by resolution No. 5-9-91 and sponsored by the State Bar to amend Civil Code section 3334, discussed the purpose of the bill in a variety of ways and used the following language: (1) "trespassers [have] earned significant business revenue (benefits) from using the land to dispose of toxic wastes" (Amelia V. Stewart, legis. representative of State Bar of Cal., letter of support for Assembly Bill No. 2663 to Assemblyman Phillip Isenberg, Chair of the Assembly Judiciary Com., Mar. 19, 1992); (2) "potential polluters would be required to disgorge the benefits obtained from any such wrongful occupation" (Michael D. Schwartz, letter of support for Assembly Bill No. 2663 to Amelia V. Stewart, legis. representative of the State Bar of Cal., Mar. 20, 1992); (3) "the law should be clear that the damages recoverable in such cases is the economic benefit to the trespasser, if that is the greater value" (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 2663 (1991–1992 Reg. Sess.)); (4) "the law should encourage proper disposal of toxic wastes. [¶] By statutorily allowing recovery of 'the benefits (profits) obtained by the occupier by reason of trespass,' courts in trespass actions will have the discretion to assess damages comparable to the benefit to the wrongful trespasser that is dumping toxic wastes" (Assem. Com. on Judiciary, 3d reading analysis of Assem. Bill No. 2663 (1991–1992 Reg. Sess.)); (5) "in some cases trespassers find it to their advantage to intentionally use another's land, reap large benefits for that act, and then pay a relatively small amount of damages for the trespass" and that "polluters may find it cheaper to dump the waste on someone else's desert land and pay relatively minor damages for that trespass, than to pay the fees for the proper disposal of the waste" (Sen. Com. on Judiciary, com. on Assem. Bill No. 2663 (1991–1992 Reg. Sess.), as amended May 27, 1992, p. 2).

This history demonstrates that the Legislature intended to eliminate financial incentives for trespass by eradicating the benefit associated with the wrongful use of another's land. This intent would not be furthered by applying the "benefits obtained" measure of damages to a trespass for which there was no financial or business advantage. In such a case, a plaintiff is limited to recovering under the other measures of damages contemplated by the statute, i.e., the reasonable rental value of the property and the cost of restoration and recovery. Thus, the $14,275,237 "benefits" damages awarded by the jury must be reversed.

### WATSON'S CROSS-APPEAL[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[*]See footnote, *ante,* page 69.

## DISPOSITION

The damages are reduced to $3,915,851. As modified, the judgment is affirmed. The parties shall bear their costs on appeal.

Doi Todd, Acting P. J., and Nott, J.,* concurred.

The petition of appellant Watson Land Company for review by the Supreme Court was denied September 28, 2005. Baxter, J., did not participate therein.

---

*Retired Associate Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.