[No. F047540. Fifth Dist. July 20, 2007.]

STARRH AND STARRH COTTON GROWERS, Plaintiff and Appellant, v. AERA ENERGY LLC, Defendant and Appellant.

[No. F048555. Fifth Dist. July 20, 2007.]

STARRH AND STARRH COTTON GROWERS, Plaintiff and Appellant, v. AERA ENERGY LLC, Defendant and Respondent.

584

COUNSEL

Law Offices of Ralph B. Wegis, Ralph B. Wegis and Michael J. Stump for Plaintiff and Appellant.

Munger, Tolles & Olson, Stephen M. Kristovich, Patrick J. Cafferty, Jr., Michael R. Barsa; Clifford & Brown and Patrick J. Osborn for Defendant and Appellant and for Defendant and Respondent.

OPINION

WISEMAN, Acting P. J.—The dispute in this case arises out of an alleged subsurface trespass resulting from the migration of wastewater produced from oil production activities on land owned by Aera Energy LLC (Aera) and adjacent to land owned by Starrh and Starrh Cotton Growers (Starrh). The wastewater, called "produced water," is naturally occurring water which is pumped out of the deep ground in conjunction with the extracted oil. It is naturally high in salts and other minerals. The water is disposed of by discharge into unlined percolation ponds. The produced water percolates down and moves into the underlying aquifers. Over time, the produced water has migrated into the aquifer underlying Starrh's property, reducing the quality of the subsurface water.

The appeal raises a number of unique legal issues. We hold that the trespass here is continuing in nature. In addition, we conclude that the evidence does not support the damages award, and that the jury was not adequately instructed on how to calculate restoration damages. At a minimum, the jury needs to be instructed that if it determines damages should be awarded it must decide (1) how much it will cost to restore the groundwater under Starrh's property to its original state; (2) whether the restoration costs are reasonable in light of all the competing interests (of which examples should be provided); (3) that it can deny damages if it concludes the restoration costs are unreasonable; and (4) that diminution in value may be a legitimate measure of damages where restoration costs are unreasonable. We also hold that profits can be "benefits obtained" within the meaning of Civil Code section 3334, subdivision (b)(1), when linked to the trespass and conclude that Starrh is entitled to attorney fees under Code of Civil Procedure section 1021.9.

### PROCEDURAL HISTORY

Starrh initiated this action in October 2001, alleging causes of action for intentional and negligent trespass. Aera answered and filed a cross-complaint

for declaratory relief on a contract and irrevocable license, and for specific performance of the contract, all arising out of an alleged agreement between Aera and Starrh concerning a right to buy or use the pore space underlying Starrh's property. The cross-complaint was resolved against Aera. There are no issues regarding the cross-complaint in this appeal. Starrh's third amended complaint was tried to a jury in November 2004. At the close of evidence, the court denied Aera's motion for nonsuit and granted Starrh's motion for a partial directed verdict, finding that the alleged trespass was a continuing trespass and not time-barred. The court also ruled that no evidence of Aera's profits would be presented to the jury.

The jury returned with its verdict in favor of Starrh, awarding Starrh $3,248,611 in avoided-cost damages (those damages avoided as a result of the disposal of produced water). With respect to restoration cost damages (those designed to return the property to its native condition) initially, the jury's verdict indicated that it was awarding zero dollars, but when the court polled the jury, this verdict lacked the required nine votes. The jury was asked to resume deliberations on the issue and ultimately returned with an award of $3.8 million.

Starrh brought a motion for new trial challenging the jury's award of restoration costs, which was denied. The court also denied Starrh's request for attorney fees pursuant to Code of Civil Procedure section 1021.9 because it found the trespass was not to " 'lands . . . under cultivation.' "

Aera appeals, claiming that the trespass is permanent as a matter of law and, as a result, is time-barred. Starrh also appeals, claiming it was error to exclude evidence concerning Aera's profits. Starrh also argues that the jury's award of restoration costs is not supported by the evidence and that it was error to deny its request for attorney fees.

## *FACTUAL HISTORY*

Starrh farms approximately 6,000 acres next to the Belridge Oil Field, located in western Kern County and owned by Aera. Aera is an oil-producing limited liability company headquartered in Bakersfield and owned by ExxonMobil and Shell Oil companies. In the process of producing oil, for every one barrel of oil extracted from the oilfield, six to nine barrels of wastewater are extracted. Produced water is high in chlorides, boron, and other dissolved solids, and comes from far below the three natural aquifers, I, 22K, and II, which lie beneath the surface lands. Aera, like other oil producers, struggles with how to dispose of the large amount of produced water associated with

extracting oil from the ground. Not surprisingly, disposal is a critical component of the production process. Aera's practice is to pump the wastewater into two unlined ponds, Lost Hills and South, where a small percentage of the water is lost through evaporation and the remainder percolates into the underlying subsurface pore space. The water, once it reaches the subsurface pore space, collects or "mounds," until natural hydrological and gravitational forces move it beyond the mound. Approximately 2.4 to 2.9 billion barrels of produced water have been disposed of in the Lost Hills and South ponding basins adjacent to Starrh's property. Although alternative methods for disposal are available, none are as economically advantageous to Aera.

Over the years as more and more produced water has moved into and out of the mound underlying the Lost Hills and South ponding basins, produced water has migrated into the pore space underlying Starrh's property. Once there, the produced water mixes with the native groundwater. As more water is put into the mound, more water will move toward Starrh's property. Aera continues to put water into the ponding basins on a daily basis.

Although the native groundwater in these aquifers is naturally salty and of questionable usability, there is no real dispute that the water under Starrh's property has been further degraded as a result of the migrating produced water, raising the native levels of salt, boron, and total dissolved solids in the water. As more water from the mound migrates into the aquifers, its impact on the native groundwater increases.

The parties agree that the native groundwater is not usable for drinking or other municipal purposes and that it is too salty to use for irrigation of most agricultural crops. The parties dispute, however, whether the native water is usable for some crops and whether it has any economic value. The area is a prime agriculture area and, in California, water is an extremely precious commodity. Historically, irrigation in the area has been by use of water imported from the California Aqueduct Project or other sources.

Starrh has been farming in the area since 1973, growing cotton, almonds, pistachios, and alfalfa. Before the lawsuit was initiated, Starrh had not used the underground aquifers as a source of irrigation water, but used aqueduct water or other purchased water. When Starrh's property was appraised in 1998, the appraiser reported that the groundwater under Starrh's property was unsuitable for irrigation because of a high level of salts and boron. The appraiser's conclusion was not surprising to Starrh because it was consistent with Starrh's understanding and experience; the water was too salty for irrigation.

Starrh's agricultural expert confirmed that the native groundwater has historically not been considered usable for irrigation. Alfalfa and almonds are boron- and salt-sensitive crops, and the native water is not suitable to grow them. Pistachios and cotton are more salt tolerant.

After the lawsuit was filed, Starrh began an experiment. It drilled several wells on the property and used a blend of aqueduct water and well water extracted from aquifer 22K to irrigate approximately 2,830 acres of cotton. Starrh is the only area farmer attempting to use groundwater for irrigation. Using the salty native groundwater for irrigation requires careful farming practices, including leaching and substantial drainage in order to prevent accumulation of the native salts and boron in the plant root zone. Aera's agricultural expert testified that only with careful farming practices could the native water be used, and, in any event, only for cotton. He opined that none of the wells on Starrh's property could be used for irrigation over the long term because of the accumulation of salts in the soil. Aera's expert also testified that blending was not economically viable.

Starrh's expert valued the underlying groundwater at $10 million if usable for the irrigation of cotton, almonds, and pistachios. He admitted the water had no dollar value if not usable for irrigation, but believed Starrh's experiment to be successful. Aera's expert valued the water at $103,000 to $121,000, if usable for irrigation, but said it was worth nothing if not usable for this purpose.

Starrh presented evidence of a restoration plan for returning the underlying groundwater to its native condition. According to Starrh's expert, the plan consists of pumping groundwater out of the subsurface aquifers by using a number of extraction wells (72 to 111). It would then be pumped into a series of lined evaporative ponds. The ponds would cover approximately 10 acres each and, together, 5,000 acres of Starrh's 6,000 acres of land. The restoration effort, while projected to last 30 years, could require up to 60 years to complete. All farming on the land would be suspended during this period of time. When done, there would be very little water left in aquifers I and 22K, although Fisher said this was a temporary condition and that with time water would reappear. There would still be dissolved solids in the water at native values, rendering the water unusable for all but the most salt-tolerant crops. The proposal was to pump most of it into lined ponding basins covering a total of 5,000 acres. The project would cost $2,269,160,693 and last for decades. According to the expert, the quality of the water would ultimately return to its native condition and no better.

## *DISCUSSION*

### *I. Permanent versus continuing trespass*

■ We begin with certain basic principles. Causing subsurface migration of oilfield wastewater into a mineral estate (groundwater pore space) of another without that landowner's consent is a trespass under California law. (*Cassinos v. Union Oil Co.* (1993) 14 Cal.App.4th 1770, 1778–1779 [18 Cal.Rptr.2d 574].) ■ Further, a trespass may be continuing or permanent. (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1219–1222 [52 Cal.Rptr.2d 518] (*Beck*).) A permanent trespass is an intrusion on property under circumstances that indicate an intention that the trespass shall be permanent. In these cases, the law considers the wrong to be completed at the time of entry and allows recovery of damages for past, present, and future harm in a single action, generally the diminution in the property's value. ■ The cause of action accrues and the statute of limitations begins to run at the time of entry. (*Kafka v. Bozio* (1923) 191 Cal. 746, 751 [218 P. 753].) The statute of limitations for trespass to property is three years. (Code Civ. Proc., § 338.)

■ In contrast, a continuing trespass is an intrusion under circumstances that indicate the trespass may be discontinued or abated. In these circumstances, damages are assessed for present and past damages only; prospective damages are not awarded because the trespass may be discontinued or abated at some time, ending the harm. (*Beck, supra,* 44 Cal.App.4th at p. 1216.) Pursuant to Civil Code section 3334, damages allowed for continuing trespass include the value of the use of the property, reasonable cost of repair or restoration to the property's original condition, and the costs of recovering possession. Continuing trespasses are essentially a series of successive injuries, and the statute of limitations begins anew with each injury. In order to recover for all harm inflicted by a continuing trespass, the plaintiff is required to bring periodic successive actions. (*Baker v. Burbank-Glendale-Pasadena Airport Authority* (1985) 39 Cal.3d 862, 869 [218 Cal.Rptr. 293, 705 P.2d 866] (*Baker*).) ■ As aptly stated in *Beck*: "These distinctions can create particular problems for the parties. For example, if the defendant is willing and able to abate the [trespass] it may be unfair to award prospective damages on the presumption that the [trespass] will continue. On the other hand, if it appears improbable that the [trespass] can or will be abated, or the plaintiff is willing that the [trespass] continue provided compensation is paid for past and prospective injuries, then it may be unreasonable to leave the plaintiff to the troublesome remedy of successive actions. And a too rigid

distinction between permanent and continuing [trespass] may constitute a trap for the unwary plaintiff who guesses wrong. For these reasons it is held that in doubtful cases the plaintiff has an election to treat a [trespass] as permanent or continuing. [Citations.]" (*Beck, supra,* 44 Cal.App.4th at p. 1217.) The distinction between continuing and permanent trespass comes up when considering two key questions in these types of cases: what is the correct measure of damages, and is the action time-barred?

The parties have staked out predictable positions. Starrh elected to treat the trespass here as a continuing trespass. Aera claims the trespass was permanent and barred by the three-year statute of limitations. There is no dispute that the produced water began migrating to the aquifers under Starrh's property more than three years from the initiation of the lawsuit. The trial court granted Starrh's motion for directed verdict, finding that the trespass was a continuing trespass as a matter of law, defeating Aera's statute of limitations defense. In making its ruling, the court said: "I think this is a question of law for the Court. . . . [¶] [W]hen we weigh all this, I think this is a continuing trespass. I think it's continuing because when we weigh all the evidence, you can't get away from the fact that Aera continues to put produced water into the ponds and that water continues to go onto [Starrh's] property."

The jury was instructed to consider whether a trespass occurred and was directed to calculate any damages within the statute of limitations period using the measure provided in Civil Code section 3334 for continuing wrongful occupation of land. The jury instruction read as follows: "If you find that the defendant has committed a trespass on the plaintiffs' property, the plaintiffs['] damages include: One, the reasonable value of the expenses that the defendants saved or avoided by reason of that wrongful occupation from October [2], 1998, through the date of the verdict; and two, the reasonable costs of restoration of the property to its condition as of October [2], 1998." In doing so, the court characterized the trespass as continuing for both the statute of limitations defense and the calculation of damages.

## A. *Statute of limitations defense*

Over the years a number of tests have developed to determine the true nature of a trespass. A good review of the relevant case law and tests that have developed is presented in *Beck* and *Mangini v. Aerojet-General Corp.* (1996) 12 Cal.4th 1087 [51 Cal.Rptr.2d 272, 912 P.2d 1220] (*Mangini*). These two cases, and the authorities they rely on, establish that the key question is

whether the trespass or nuisance can be discontinued or abated and there are a number of tests used to answer this question. A respected legal treatise summarizes the various tests as follows: "[W]hether (1) the offense activity is currently continuing, which indicates that the nuisance is continuing, (2) the impact of the condition will vary over time, indicating a continuing nuisance, or (3) the nuisance can be abated at any time, in a reasonable manner and for reasonable cost, and is feasible by comparison of the benefits and detriments to be gained by abatement." (8 Miller & Starr, Cal. Real Estate (3d ed. 2000) § 22.39, pp. 148–149.) As *Beck* observes, in pollution cases, particularly where the issue is whether the claim is time-barred, there are peculiar problems in applying the "continuing-use/permanent-encroachment dichotomy because the harmful effects of the pollution may continue beyond the termination of the activity that gave rise to the harm." (*Beck, supra,* 44 Cal.App.4th at p. 1218.)

The problem here arises in how to apply these principles. Aera argues that this case is controlled by the decision in *Mangini*. Although *Mangini* is a nuisance case, generally the principles governing the permanent or continuing nature of a trespass or nuisance are the same and the cases discuss the two causes of action without distinction. (*Beck, supra,* 44 Cal.App.4th at pp. 1216–1221, and authorities cited therein.)

■ *Mangini* involved the dumping of toxic materials onto land by a prior owner. The prior owner attempted to defend the action by asserting that the statute of limitations barred the action because it was brought more than three years after the dumping had stopped. The current owner plaintiff sought to avoid the statute of limitations defense by arguing that, because the toxic materials continued to migrate onto the plaintiff's land causing continuous damage, the nuisance was continuing. In deciding the issue, the court said the key to whether a trespass is permanent (and, at least in *Mangini,* time-barred) or continuing is whether the trespass can be discontinued or abated at a reasonable cost. (*Mangini, supra,* 12 Cal.4th at pp. 1090, 1103.) The court said there must be evidence that the trespass is *reasonably* abatable even if the harm caused by the trespass continues to interfere with the possessory interest of the property owner. (*Id.* at p. 1103.) Technical feasibility does not necessarily prove abatability. It must be possible to clean up the toxic materials without unreasonable hardship or expense. (*Id.* at p. 1099.) In *Mangini,* since no evidence was presented concerning the cost of cleaning up the toxic materials that were dumped on the plaintiff's property, the court concluded that the plaintiff had failed to prove a continuing nuisance or trespass and the action was time-barred. (*Ibid.*)

*Mangini* stated that its decision was limited to cases where a property owner seeks to maintain a nuisance action after the three-year statute of limitations has expired on the theory that the nuisance is continuing in nature. It addressed the narrow question of whether the property owner may pursue a nuisance action without presenting evidence that the injury is one capable of reasonably being abated. (*Mangini, supra,* 12 Cal.4th at p. 1104.) Significantly, in *Mangini,* the harmful activity had stopped long ago and there was no evidence the impact of the toxic materials would vary over time. Therefore, only the last of the available tests for characterizing the nuisance as continuing was available to defeat the statute of limitations defense. Since the plaintiff failed to offer *any* evidence on the reasonableness of possible abatement, it could not avoid the statute of limitations by recharacterizing the nuisance as continuing on the ground that it could be abated at any time. (*Id.* at pp. 1103–1104.)

Aera contends that the decision in *Mangini* controls because it is the latest pronouncement by the California Supreme Court. In doing so, Aera overlooks the fact that, unlike in *Mangini,* the first two tests identified in Miller and Starr—the offensive activity continues and the impact of the subsurface migration will worsen as time passes—are available here. (8 Miller & Starr, *supra,* § 22.39, p. 148.) Applying these two tests points toward a conclusion that Aera's ponding practices establish a continuing trespass onto Starrh's property. (*Ibid.*)

Our conclusion is consistent with *Mangini,* which did not change existing law. Instead, *Mangini* applied well-established principles to a somewhat unique factual situation and concluded that the only available test—the reasonable-abatement test—had not been proven.

In *Spar v. Pacific Bell* (1991) 235 Cal.App.3d 1480 [1 Cal.Rptr.2d 480], the offensive action was completed long before the lawsuit was initiated (telephone lines, etc., buried 25 years prior to the lawsuit). The plaintiff claimed these items were a continuing trespass because they remained on the property and sought to defeat the statute of limitations claim raised by the defense. We do not have the same situation here. (See also *Field-Escandon v. DeMann* (1988) 204 Cal.App.3d 228 [251 Cal.Rptr. 49].) Both *Spar* and *Field-Escandon* involve permanent structures such as pipelines, buildings, walls and fences, long considered permanent nuisances for purposes of the three-year statute of limitations. (*Field-Escandon v. DeMann, supra,* at pp. 233–234.) Aera attempts to characterize the ponds as permanent structures claiming they are "massive, bermed basins that were built in the 1950s and

1960s and cover hundreds of acres." Aera's comparison misses the point—it is not the pond's structure that constitutes a trespass. Instead, it is the produced water that permeates through the pond that is a trespass.

This case is more closely aligned with *Baker, supra,* 39 Cal.3d at page 872 (cited with approval in *Mangini*). The situation in *Baker* involved complaints regarding noise and vibration from a nearby airport. As is the case here, the nuisance began long before the lawsuit was filed and well after the three-year statute of limitations had run on the original nuisance. The defendant sought to have the nuisance classified as permanent in order to assert the three-year statute of limitations as a complete bar to the action, even though it was undisputed that the flights continued on a daily basis. The defendant argued that, because the plaintiff could not interfere with federally controlled air traffic routes, the nuisance was not reasonably abatable and had to be classified as permanent. The court determined there were other possibilities for abatement and stated that "[w]here *some means* of abatement exists, there is little or no incentive to make remedial efforts once the nuisance is classified as permanent. Such a result is at odds with tort law's philosophy of encouraging innovation and repair to decrease future harm." (*Baker, supra,* at p. 872, italics added.) Although the airport could not reasonably be shut down, it was possible to abate in some manner the noise and vibration caused by the flights over the plaintiff's home and, under *Baker,* those options had to be explored. *Baker* remains good law and it controls here.

In this case, the question turns on whether Aera will continue to allow produced water to enter the underlying aquifers. As long as this practice is used, the water table below Starrh's property will continue to be degraded as more and more produced water mixes with the native groundwater. Starrh's expert testified that dumping more produced water into the unlined ponds will have an impact on the native groundwater under Starrh's property. This harm can be abated *by some means.* For example, the ponding practice can be reduced or discontinued altogether, resulting in a lessening of the impact on the underlying aquifers. (See *Beatty v. Washington Metropolitan Area Transit Authority* (D.C. Cir. 1988) 274 U.S. App.D.C. 25 [860 F.2d 1117, 1124] [nuisance is abatable if it can be diminished].)

We reject Aera's contention that *Wilshire Westwood Associates v. Atlantic Richfield Co.* (1993) 20 Cal.App.4th 732 [24 Cal.Rptr.2d 562] governs this case. In *Wilshire,* liability arose from a leaking gasoline tank under a gas station. Although the gas station remained, there was nothing to suggest that the leakage continued. (*Id.* at pp. 745–746.) We are also not persuaded by Aera's contention that, even if it stopped its ponding practice, the water

would continue to migrate, relegating the trespass to permanent status because the migration cannot be stopped. Although stopping the ponding practice may not eliminate the migration, failing to stop the practice most assuredly compounds the problem. (See also *Baugh v. Garl* (2006) 137 Cal.App.4th 737, 747 [40 Cal.Rptr.3d 539] [where trespass is continuing, but not necessarily permanent, statute does not bar action until three years after last act of trespass].)

In our view, this case presents a classic continuing trespass situation. Our conclusion is consistent with *Mangini,* which warned that courts should be cautious not to enlarge the category of permanent nuisance beyond those structures or conditions that truly are permanent. It stressed that, where some means of abatement exist, classifying the trespass or nuisance as permanent will discourage remedial efforts. (*Mangini, supra,* 12 Cal.4th at p. 1104.) This is especially important as courts attempt to balance the evolving tension between economic interests and environmental protection. Classifying this case as a permanent trespass for purposes of the statute of limitations would bar this action completely. It would give Aera the ability to continue environmentally questionable practices with no economic incentive to employ more environmentally protective practices.

It is also important to recall that this is an appeal from a judgment based upon a partially directed verdict. Generally, whether a trespass is continuing or permanent is a question of fact properly submitted to the jury. (*Shamsian v. Atlantic Richfield Co.* (2003) 107 Cal.App.4th 967, 980 [132 Cal.Rptr.2d 635].) A trial court may remove the issue of fact from the jury by directed verdict only if there is no evidence tending to prove the case of the party opposing the motion. (*Estate of Fossa* (1962) 210 Cal.App.2d 464, 466 [26 Cal.Rptr. 687].) Since the impact, if any, of the procedural status of this case was not addressed at trial, we issued supplemental briefing orders asking Aera to provide any evidentiary support for a finding that its ponding of produced water could not be discontinued.

Aera provided us with no record citations to support a factual conclusion different from that reached by the trial court, i.e., that the trespassing was continuing. Instead, it repeated its argument that the trespass was permanent because abatement was not reasonably possible. (Ironically, in its response to our briefing letter, Aera acknowledged it was pursuing a plan to create ponding basins in another location—the west-side ponds.) The bottom line is that Aera cites no trial evidence to support a finding that it was unable to discontinue its ponding practice. To the contrary, Aera officials testified they would continue the ponding practices for economic reasons as long as they were allowed to do so, but admitted other methods of disposal were available at a higher cost. In a nutshell, the ponding practices continue

because Aera has chosen to keep using them. The trial court properly granted the motion for directed verdict, eliminating Aera's statute of limitations claim.

## B. Measure of damages

Aera contends that, even if we conclude the trespass is continuing for purposes of the statute of limitations period, *Mangini* allows for a different characterization to be attached to the trespass for purposes of measuring damages, and that in this case the trespass is permanent for this purpose. In doing so, Aera argues that Starrh's damages should be limited to only the diminution of value caused by Aera's trespass. Aera asserts this is the proper measure of damages because *Mangini* holds that, in order to recover using a continuing-trespass measure of damages, a plaintiff must show that the trespass is reasonably abatable. *Mangini* left open the question of whether a trespass may be continuing for purposes of evaluating a statute of limitations defense but permanent when determining the correct measure of damages. (*Mangini, supra*, 12 Cal.4th at p. 1104.)

(10) As we have already indicated, the characterization of a trespass as either permanent or continuing is based on whether the trespass will actually continue into the future or is likely to be discontinued at some later date. This is a question of fact subject to proof at trial. (*Mangini v. Aerojet-General Corp.* (1991) 230 Cal.App.3d 1125, 1147 [281 Cal.Rptr. 827].) If the trespass will definitely continue into the future, because it cannot be abated, then damages can be fully ascertained and full recovery is available to the plaintiff for all harm suffered. If it cannot be determined whether the harm will continue, because it is possible to terminate the trespass, the law will not presume that the trespass actually will be discontinued. (*Baker, supra*, 39 Cal.3d at pp. 868–870.) Under these circumstances, future damages cannot be determined and will not be awarded. (*Kafka v. Bozio, supra*, 191 Cal. at p. 751.) In fact, the very nature of this characterization is related to the damages suffered. (*Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 937 [101 Cal.Rptr. 568, 496 P.2d 480] [whether trespass is continuing or permanent depends on type of harm suffered].) Although useful for purposes of determining the proper statute of limitations, the question of whether a trespass is continuing or permanent is ultimately a damages question. The "nature" of a trespass does not change simply to accommodate a legal theory.

The trial court found Aera's trespass to be continuing because Aera persists in disposing of produced water into its unlined ponding basins. As a result, produced water continues to migrate onto Starrh's property and degrade the quality of its underlying aquifers. The evidence shows that it is unknown how long the trespass will continue because, as we have explained, Aera may stop

or alter its disposal practices at any time. For this reason, it is impossible to ascertain the full extent of future damages to Starrh's underlying aquifers. As a result, in this case, a permanent measure of damages, which includes future harm, is not an appropriate choice. (See *Baker, supra,* 39 Cal.3d at p. 869 [prospective damages not permitted in continuing trespass cases]; 8 Miller & Starr, *supra,* § 22:20, pp. 83–84.)

■ In any trespass case, the proper measure of damages is the one that will fully compensate the plaintiff for damages that have occurred or can with certainty be expected to occur. (See *Basin Oil Co. v. Baash-Ross Tool Co.* (1954) 125 Cal.App.2d 578, 606 [271 P.2d 122] [there are many ways to measure damages for wrongful occupation of property and courts must be flexible and choose measures allowing full recovery as appropriate to circumstances]; *Cassinos v. Union Oil Co., supra,* 14 Cal.App.4th at p. 1785 [each case must be determined on its facts applying rule best suited to determine amount of loss].) Further, damages may cover the loss or injury sustained and no more. (*Estate of de Laveaga* (1958) 50 Cal.2d 480, 488 [326 P.2d 129].) "[T]he general rule is that if the cost of repairing the injury and restoring the premises to their original condition amounts to less than the diminution in value of the property, such cost is the proper measure of damages; and if the cost of restoration will exceed such diminution in value, then the diminution in value of the property is the proper measure [citations]." (*Mozzetti v. City of Brisbane* (1977) 67 Cal.App.3d 565, 576 [136 Cal.Rptr. 751], italics omitted; see also *Harrisonville v. Dickey Clay Co.* (1933) 289 U.S. 334, 337–341 [77 L.Ed. 1208, 53 S.Ct. 602].)

In California, when the trespass involves a wrongful occupation of land, Civil Code section 3334, subdivision (a), sets out the proper measure of damages—including damages for a subsurface trespass. (See *Cassinos v. Union Oil Co., supra,* 14 Cal.App.4th at p. 1780.) The statute reads: "(a) The detriment caused by the wrongful occupation of real property . . . is deemed to include the value of the use of the property for the time of that wrongful occupation, . . . the *reasonable* cost of repair or restoration of the property to its original condition, and the costs, if any, of recovering the possession." (§ 3334, subd. (a), italics added.)

■ In this context, abatement is simply another word for restoration. In order to abate or restore the subsurface trespass, the contamination must be cleaned up. Starrh may recover the costs of restoration as a statutory measure of damages *only* if cleaning up the contamination is possible or economically practical. (8 Miller & Starr, *supra,* § 22.20, pp. 82–85.) We conclude that

when the cost of abatement is not reasonable, these costs cannot be recovered under either Civil Code section 3334 or the reasonable-abatement requirement expressed in *Mangini*. As a result, the trial court correctly determined that the trespass was continuing—both in calculating the statute of limitations and determining the measure of damages. However, our analysis does not end here.

### C. Sufficiency of the evidence/jury instructions

In its cross-appeal, Starrh contends that the jury's award of $3.8 million for restoration costs is not supported by the verdict. It argues there is no evidence to support a finding that this amount would restore Starrh's property to its original condition. We agree that there is no record evidence to support the jury's $3.8 million award for restoration costs. During oral argument, Aera's counsel suggested that the jury reached this number by rejecting some of the underlying assumptions upon which the one-time capital value of the water assigned by the experts rested. However, this is not the appropriate measure of damages; the jury was asked to determine the reasonable cost of restoration, not the value of the land. (Civ. Code, § 3334.) In any event, counsel was unable to cite any particular "assumption" that if rejected by the jury would result in the $3.8 million figure. Unlike general damages, restoration cost is a statutorily authorized economic damage which must rest on specific evidence or be reached by a mathematical manipulation of the evidence presented. (See Civ. Code, § 1431.2, subd. (b)(1) [economic damages are those that are objectively verifiable monetary losses, including loss of use of property and costs of repair or replacement]; Civ. Code, § 1431.2, subd. (b)(2) [noneconomic damages subjective, nonmonetary losses including, but not limited to, pain, suffering, inconvenience, etc.]; see also *Beeman v. Burling* (1990) 216 Cal.App.3d 1586, 1599 [265 Cal.Rptr. 719] [general damages are those necessarily resulting from act complained of and are implied by law to have accrued to plaintiff; special damages are damages which depend on circumstances peculiar to infliction of each respective injury and can be documented].) Aera could not identify any evidence to support the award, and we have found none in our review of the record. Since there is no evidentiary support for the verdict, this case must be remanded for a new trial on the issue of damages.

Although neither party directly contests the sufficiency of the instructions, we conclude the instructions given were inadequate and, in the interest of judicial economy, we provide some guidance to the trial court and the parties[1] in the event of a retrial. The trial court must instruct the jury on how to determine whether the statutory requirement that any restoration costs

---

[1] It is the parties' responsibility to request instructions that address each theory of their case, and the court is under no duty to instruct in the absence of a request. (*Agarwal v. Johnson*

be reasonable was met. It must also advise the jury what to do if the jury concludes the evidence shows the proposed restoration project to be unreasonable. As we have already stated in our discussion of the proper measure of damages, there are many ways to measure damages and the ultimate goal is to restore the plaintiff to its former position. (*Basin Oil Co. v. Baash-Ross Tool Co., supra,* 125 Cal.App.2d at p. 606; *Cassinos v. Union Oil Co., supra,* 14 Cal.App.4th at p. 1785.)

 We repeat, Civil Code section 3334 requires that restoration costs be *reasonable.* In addition, general principles of damages in trespass cases require that the damages bear a *reasonable* relationship to the harm caused by the trespass. *Mangini* explains that whether abatement costs are *reasonable* requires an evaluation of a number of fundamental considerations, including the expense and time required to perform the abatement, along with other legitimate competing interests. (*Mangini, supra,* 12 Cal.4th at p. 1100; see also *Beck, supra,* 44 Cal.App.4th at pp. 1221–1222 [reasonableness includes consideration of monetary expense, burden on public, and costs of remediation versus value of land].)

In order to balance these competing interests, a jury must be told that once it resolves the factual issue of how much it might cost to restore the groundwater under Starrh's property to its original state (resolving the evidence presented by the experts), it must then determine whether the restoration costs are reasonable in light of all the competing interests. Without proper instruction, a jury will have a very difficult time knowing how to go about its evaluation of damages. This is particularly true in light of the fact that the proposed restoration project arguably bears little relationship to the current use and value of the land, coupled with the historic understanding of the availability of the water for irrigation and other uses.

The evidence of unreasonableness in this case is sufficiently strong that we are tempted to conclude that the project is unreasonable as a matter of law. Dr. Fisher explained that his restoration plan was designed to contain the migration of the produced water and to restore the groundwater to "useful status," although he admitted that he meant the project would return the groundwater to its native condition. Fisher estimated that the cost of this ambitious project would be more than $2 *billion in today's dollars* and would be the largest restoration project in the world to date. In contrast, the evidence of the groundwater's value ranged from a one-time capital value of $10 million (Starrh's expert) to a one-time capital value of $103,000 to $121,000 (Aera's expert). There was evidence that the native groundwater could not be used for drinking or irrigation of agricultural crops, with the exception of

(1979) 25 Cal.3d 932, 951 [160 Cal.Rptr. 141, 603 P.2d 58]; *Scofield v. Critical Air Medicine, Inc.* (1996) 45 Cal.App.4th 990, 1010 [52 Cal.Rptr.2d 915].)

cotton and other high-salt-tolerant plants. There was also evidence that Starrh's plan to use a 50-50 blend of native groundwater and aqueduct water for irrigation was not cost effective. Further, Aera's expert testified that if Starrh stopped growing cotton, the groundwater had no economic value.

We resist the temptation to decide the proposed project is unreasonable as a matter of law, acknowledging that reasonableness is a question of fact to be decided by a properly instructed jury—a determination that has not yet been done. A properly instructed jury is in the best position to decide the question of reasonableness and will be able to do so assuming it is told to apply the appropriate legal principles. For example, the jury needs to be advised that it can deny damages if it concludes the restoration costs are unreasonable. It should be instructed that diminution in value may be a legitimate measure of damages where restoration costs are unreasonable. (See *Mozzetti v. City of Brisbane, supra*, 67 Cal.App.3d at p. 576.) The failure to provide these instructions resulted in predictable confusion as evidenced by the jury's attempt to reach a verdict on restoration costs. Eight members initially found *zero damages*. Having failed to reach the required nine votes, the jury was directed to continue deliberations and only then returned with an award of *$3.8 million*—an amount which is not supported by any logical interpretation of the evidence. In sum, on remand, the jury needs to know how to determine whether the restoration plan is reasonable and what to do if it determines the plan is unreasonable.

## II. *Other contentions of error*

Since we are reversing the damages award, we will address other issues likely to arise on remand. These include the trial court's conclusion that the "benefits obtained" measure of damages pursuant to Civil Code section 3334 is restricted to costs saved or avoided by the wrongful trespass. We will also consider whether Starrh is entitled to attorney fees pursuant to Code of Civil Procedure section 1021.9.

### A. *Definition of "benefits obtained"*

The trial court ruled that "benefits obtained" as used in Civil Code section 3334 are costs equal to those avoided by the trespasser—nothing more. It rejected Starrh's position that the phrase "benefits obtained" should be read to also include Aera's profits. As a result of this decision, evidence of Aera's profits was excluded and the jury was told that the measure of damages for the trespass included the "reasonable value of the expenses that the defendants saved or avoided by reason of the wrongful occupation."

Generally, we review for an abuse of discretion a trial court's decisions admitting or excluding evidence. (*City of Ripon v. Sweetin* (2002) 100

Cal.App.4th 887, 900 [122 Cal.Rptr.2d 802].) However, when the trial court's decision is based on a conclusion of law, we apply the de novo standard of review. (*Lockheed Litigation Cases* (2004) 115 Cal.App.4th 558, 564 [10 Cal.Rptr.3d 34]; *Penner v. County of Santa Barbara* (1995) 37 Cal.App.4th 1672, 1676 [44 Cal.Rptr.2d 606].) The trial court's decision in this case rests on its interpretation of Civil Code section 3334, subdivision (b)(1). Questions concerning interpretations of statutes are questions of law which we review de novo. (*Day v. Collingwood* (2006) 144 Cal.App.4th 1116, 1126 [50 Cal.Rptr.3d 903].)

Civil Code section 3334, subdivision (b)(1), states: "(b)(1) . . . for purposes of subdivision (a), the value of the use of the property shall be the greater of the reasonable rental value of that property or the *benefits obtained* by the person wrongfully occupying the property by reason of that wrongful occupation." (Italics added.) It was amended in 1992 to address a specific problem as to how damages were awarded for the wrongful occupation of land. Before the amendment, damages were limited in wrongful occupation cases to the value of the use of the property—usually the fair rental value. As a result, some polluters would dump their waste on unoccupied land of little value (e.g., desert land) in order to avoid expensive toxic waste disposal fees. If the owner of the property sought redress, the polluter faced relatively low potential damage awards because the land was essentially worthless. (Sen. Com. on Judiciary, com. on Assem. Bill No. 2663 (1991–1992 Reg. Sess.) for Mar. 25, 1992, hearing; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 2663 (1991–1992 Reg. Sess.) as amended July 1, 1992.)

The Legislature's goal was to remove any economic incentive to choose illegal dumping over the proper disposal of toxic waste. It did so by amending the statute to include as an alternative to the reasonable rental value of the land, the recovery of the economic benefits obtained by the trespasser as a result of the illegal dumping. (Legis. Counsel's Dig., Assem. Bill No. 2663 (1991–1992 Reg. Sess.) as amended July 1, 1992); Assem. Com. on Judiciary, 3d reading analysis of Assem. Bill No. 2663 (1991–1992 Reg. Sess.).) The amendments created not only a measure of damages for the property owner, but an economic disincentive to would-be polluters.

Only one case has interpreted Civil Code section 3334, subdivision (b)(1), as amended. In *Watson Land Co. v. Shell Oil Co.* (2005) 130 Cal.App.4th 69 [29 Cal.Rptr.3d 343] (*Watson*),[2] the issue was whether the phrase "benefits obtained" included the avoidance of restoration costs. The court answered "no" and commented that restoration costs are included in another provision

---

[2] At Starrh's request, we have taken judicial notice of the opinion in *Watson*, as well as the briefs filed by the parties.

of the statute. (Civ. Code, § 3334, subd. (a).) By doing so, *Watson* determined that including avoided restoration costs in Code of Civil Procedure section 3334, subdivision (b)(1) would render superfluous the " 'reasonable cost of repair or restoration' " language in subdivision (a). (*Watson, supra,* at p. 78.) *Watson* held that the avoidance of restoration costs is not a "benefit" recoverable under the statute. Its analysis, however, acknowledges that a direct financial or business advantage is a "benefit" under the statutory language. *Watson* observed that the history of the statute "demonstrates that the Legislature intended to eliminate financial incentives for trespass by eradicating the benefit associated with the wrongful use of another's land." (*Id.* at p. 79.) We agree and conclude that the phrase "benefits obtained" has a wider scope than that given to it by the trial court here—assuming there is a direct link between the financial benefit and the trespass.

 There is nothing in Civil Code section 3334 or its legislative history to suggest that the phrase "benefits obtained" should be read narrowly. To the contrary, the intent of the Legislature was to eliminate *any* economic incentive to trespass as a means of waste disposal. (Sen. Com. on Judiciary, com. on Assem. Bill No. 2663 (1991–1992 Reg. Sess.) for June 23, 1992, hearing, p. 2.) If the Legislature had wanted to limit the phrase "benefits obtained" to costs avoided, it could easily have done so.

 Further, this interpretation is consistent with the fundamental rule that the prime consideration in interpreting a statute is to achieve the objective of the statute. (*Watson, supra,* 130 Cal.App.4th at p. 77.) As we have indicated, the evil to be prevented by the 1992 amendments is identified in the legislative history—to prevent any economic advantage for polluters resulting from the wrongful dumping on another's land.

Trial courts in trespass actions have historically been given great flexibility to award damages that fit the particular facts of the case. (See *Cassinos v. Union Oil Co., supra,* 14 Cal.App.4th at pp. 1784–1785; *Givens v. Markall* (1942) 51 Cal.App.2d 374, 379, 380 [124 P.2d 839] [whatever rule is best suited to determine amount of loss in particular case should be adopted].) Aera has admitted that it chose the challenged method for disposing of produced water because it was the least expensive alternative and maximized its profits. In light of these factors, we conclude that the term "benefits obtained" may include profits enjoyed by Aera that are directly linked to the wrongful trespass.

On remand, we caution the parties that a direct link requires some showing that a portion of the profit earned by the trespasser actually was tied to the decision leading to the trespass. It is not enough to simply measure the profits earned in any given time period or proportion them to a particular part of the

trespasser's business. At trial, Starrh's position was that, because the ability to dispose of produced water is critical to Aera's ability to generate oil, Aera's overall profits were linked directly to the wrongful occupation of Starrh's property. If Aera could not dispose of its produced water it would have to shut down production of its wells and forgo the profits that accompany production. Starrh looked only at Aera's bottom-line profit figures, assigned a percentage to the amount of produced water disposed of in the South and Lost Hills ponds compared to the total amount of water disposed, and multiplied the percentage and the total profits to reach what they claim are the profits "obtained" by the trespass.

This approach oversimplifies the link required under Civil Code section 3334 and ignores the possibility that not all of the produced water sent to the Lost Hills and South ponding basins ended up in Starrh's subsurface basin. Some of those barrels of produced water evaporated and some remain on Aera's property.

The argument also ignores the alternative methods of disposal available to Aera. Aera's Belridge Asset Water Strategy Project team came up with numerous potential disposal alternatives, including electrodialysis downhole disposal, reverse osmosis with downhole disposal, treatment of water for agricultural use, and others. For example, Barry Biggs testified that, as early as 1988, a team was asked to evaluate and propose alternatives to the percolation ponds. The team talked about a number of options. Ken Knight testified that management decided to continue to use the unlined ponds for water disposal as long as possible because this was the most economical option for the company. Using the ponding basins would cost 1.5 cents per barrel, where other methods would cost 35 to 76 cents per barrel. Knight stated that if Aera were told to stop putting water into the ponds today they would have to shut down production, but he explained that his job was to look for locations and other systems to dispose of the produced water. He said, "[I]f we were to be phased out of our east pond systems [Lost Hills and South ponds], then we would have to find new locations to put the [produced] water." Also, Dr. Sunding, an agricultural economist, named numerous companies who would haul away the water and dispose of it at a price ranging from $6.30 a barrel to $25.20 a barrel.

The evidence indisputably establishes that alternative, although more expensive, methods of disposal were available to Aera. The unquestionable intent in using the ponding method was to maximize profits; however, this does not mean that no profits would be earned if other methods were selected. For example, Starrh acknowledged at trial that if Aera had to pay $1 a barrel (as opposed to 1.5 cents per barrel) to dispose of its produced water that Aera would still make approximately $1.4 billion in profit!

On remand, Starrh should be permitted to introduce evidence that some portion of Aera's profits is tied to the use of less expensive means of disposing of produced water. However, the trial court needs to ensure that any evidence of "benefits obtained" is directly linked to the wrongful trespass.

### B. Attorney fees

We next address whether Starrh is entitled to attorney fees pursuant to Code of Civil Procedure section 1021.9 (section 1021.9) because the trespass was on "lands . . . under cultivation." (*Ibid.*) Aera argues that Starrh is not entitled to attorney fees because the trespass was to a groundwater right only and not to "lands . . . under cultivation." Section 1021.9 provides: "In any action to recover damages to personal or real property resulting from trespassing on lands either under cultivation or intended or used for the raising of livestock, the prevailing plaintiff shall be entitled to reasonable attorney's fees in addition to other costs, and in addition to any liability for damages imposed by law."

None of the cases interpreting section 1021.9 squarely address the issue here—whether the statute includes attorney fees for a subsurface trespass to a right that runs appurtenant to cultivated land.[3]

We begin our analysis with the obvious. Starrh's property is indisputably "land under cultivation." It is rural and has been commercially farmed for decades. Further, Aera's conduct which resulted in its produced water migrating into the subsurface groundwater tables beneath Starrh's property unquestionably is a trespass to Starrh's property interest. The only remaining question is whether section 1021.9 allows recovery solely for surface trespasses—not subsurface trespasses.

To determine the meaning of a statute, we look to its language, acknowledging that the words the Legislature has chosen are the best indicators of its intent. (*Freedom Newspapers, Inc. v. Orange County Employees Retirement System* (1993) 6 Cal.4th 821, 826 [25 Cal.Rptr.2d 148, 863 P.2d 218].) In doing so, we give words their literal meaning unless that meaning is inconsistent with the legislative intent. (*Lungren v. Deukmejian*

---

[3] In *Haworth v. Lira* (1991) 232 Cal.App.3d 1362 [284 Cal.Rptr. 62], the court allowed recovery under the statute to a plaintiff who lived in a rural setting, but did not raise horses, goats, and poultry as a commercial venture. The court held that nothing in the statute limited recovery to the commercial livestock industry. (*Id.* at p. 1371.) In *Elton v. Anheuser-Busch Beverage Group, Inc.* (1996) 50 Cal.App.4th 1301, 1308 [58 Cal.Rptr.2d 303], the court held that negligently causing a fire to enter and harm the plaintiff's property was a trespass within the meaning of the statute. Last, in *Quarterman v. Kefauver* (1997) 55 Cal.App.4th 1366, 1375 [64 Cal.Rptr.2d 741], the court refused to apply the statute to an urban backyard gardener whose soil was contaminated by lead paint dust and chips.

(1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299]; *Clean Air Constituency v. California State Air Resources Bd.* (1974) 11 Cal.3d 801, 813 [114 Cal.Rptr. 577, 523 P.2d 617].)

 Starrh has a right to extract the groundwater and put it to reasonable use. This is one of the bundle of rights Starrh holds as a property owner. (*City of Barstow v. Mojave Water Agency* (2000) 23 Cal.4th 1224, 1240 [99 Cal.Rptr.2d 294, 5 P.3d 853] [underground water rights appurtenant to land].) A trespass violates the landowner's property rights and "need not take the form of a personal entry onto the property by the wrongdoer." (*Elton v. Anheuser-Busch Beverage Group, Inc., supra,* 50 Cal.App.4th at p. 1306.) In addition, the law has long recognized that a trespass can be above or below the surface of the land. (Rest.2d Torts, § 159; *KFC Western, Inc. v. Meghrig* (1994) 23 Cal.App.4th 1167, 1181 [28 Cal.Rptr.2d 676] [contaminants in subsoil left on property by previous owner constitute trespass]; *Union Oil Co. v. Mutual Oil Co.* (1937) 19 Cal.App.2d 409, 413 [65 P.2d 896].) There is nothing in the statutory language that suggests an intention to treat surface trespasses differently from subsurface trespasses. Further, Aera has cited no authority in support of its position that section 1021.9 does not apply to subsurface trespasses. We will assume that the Legislature, in enacting section 1021.9, was aware of existing law which treats the subsurface interference with a property owner's right as a trespass and "intended to maintain a consistent body of rules." (*Scott Co. v. Workers' Comp. Appeals Bd.* (1983) 139 Cal.App.3d 98, 105 [188 Cal.Rptr. 537].) For these reasons, we conclude that section 1021.9 relates to both surface and subsurface property rights.

The legislative history of section 1021.9 supports our conclusion. The statute was proposed originally by the California Cattlemen's Association because it claimed that rural landowners were suffering tremendous losses each year due to trespass and were required to take costly steps to protect their properties, including constructing fences and posting signs. According to the association, trespassers came upon rural land, using forcible entry through locked gates. " 'A damaged fence or unlocked gate can result in theft or escape of valuable livestock, vicious vandalism of farm equipment, and destruction of natural resources.' " (Assem. Com. on Judiciary, analysis of Sen. Bill No. 2513 (1985–1986 Reg. Sess.) as amended May 1, 1986, quoting California Cattlemen's Association.) The bill as initially proposed and passed by the Senate created liability for the driver of a motor vehicle who entered rural property and tampered with any fence or gate and also awarded attorney fees. It was drafted to address a specific problem.

When the bill came to the Assembly, however, it was modified. The Assembly Judiciary Committee Bill analysis noted that the "proponent of this

measure has indicated that it had intended for this bill to impose liability for all property damage which results from a person's improper entry onto specified lands in the manner described in the bill. However, as drafted, the bill provides for liability only for the cost of mitigation, restoration or repair of a fence or gate." (Assem. Com. on Judiciary, analysis of Sen. Bill No. 2513 (1985–1986 Reg. Sess.) as amended May 1, 1986, p. 2.) The bill was amended in the Assembly to its current form.

A subsequent Senate Rules Committee analysis characterized the change this way: "The bill now requires the award of reasonable attorneys' fees to a prevailing plaintiff in an action to recover damages to property resulting from trespassing on lands under cultivation or used for raising livestock." (Sen. Rules Com., Off. of Sen. Floor Analyses, analysis of Sen. Bill No. 2513 (1985–1986 Reg. Sess.) as amended Aug. 12, 1986.) The argument in support of the expanded language was that the bill was needed "to enhance the ability of ranchers to sue trespassers for damages, particularly in those cases where the rancher must now either compromise a significant portion of a valid claim by suing in small claims court . . . or by spending a major share of the recovery to pay his or her attorney." (Sen. Rules Com., Off. of Sen. Floor Analyses, analysis of Sen. Bill No. 2513 (1985–1986 Reg. Sess.) as amended Aug. 12, 1986, p. 2.) The Legislative Counsel's Digest for the bill as amended states that "[t]his bill would authorize the recovery of attorney's fees in *any action* to recover *damages to personal or real property resulting from trespass* on lands either under cultivation or intended or used for the raising of livestock." (Legis. Counsel's Dig., Sen. Bill No. 2513 (1985–1986 Reg. Sess.) as amended Apr. 10, 1986, italics added.)

This legislative history suggests that, although the initial proposal was limited to the harm caused by entry onto rural land by motor vehicles or by trespassers walking upon the land through fences and gates, the ultimate version of the bill broadened the statute's scope in order to "enhance the ability of ranchers to sue trespassers for damages." (Sen. Rules Com., Off. of Sen. Floor Analyses, analysis of Sen. Bill No. 2513 (1985–1986 Reg. Sess.) as amended Aug. 12, 1986, p. 2.) It included any action to recover damages of any kind caused by trespass to lands under cultivation. The Legislature's obvious concern was for the farm and ranch communities of our state.

■ We recognize that agriculture is an essential part of California's economy and the industry's interests are unique. Although section 1021.9 does not authorize a blank check for attorney fees payable to the agricultural community, we do believe it authorizes reasonable fees in trespass cases such as this one. Consequently, we conclude that section 1021.9 allows for the recovery of reasonable attorney fees in prosecuting an action alleging a subsurface trespass to land.

## *DISPOSITION*

The judgment is reversed for retrial on the issue of benefits obtained and restoration damages. The order denying attorney fees pursuant to Code of Civil Procedure section 1021.9 is reversed. Each party shall bear its own costs on appeal.

Cornell, J., and Hill, J., concurred.

A petition for a rehearing was denied August 15, 2007, and the petition of appellant Aera Energy LLC for review by the Supreme Court was denied October 24, 2007, S155780. Baxter, J., and Chin, J., did not participate therein.