Filed 8/21/23  Mohammadi v. City of Fresno CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| REZA MOHAMMADI,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CITY OF FRESNO et al.,<br><br>Defendants and Appellants. | F083633<br><br>(Super. Ct. No. 16CECG01808 )<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGEMENT]** |

**THE COURT:**

It is so ordered that the opinion filed on July 24, 2023, be modified as follows:

1.  On page 6, second sentence of the second full paragraph, the first word "However," is removed so the sentence now reads:

> Defendants do not cite to any testimony of Dr. Pazoki before the jury which they contend should not have been admitted or was prejudicial.

2.  On page 27 and carrying over to page 28, footnote 8 is inserted immediately after the second sentence beginning "If defendants believed" and before the citation "(*Taylor*, *supra*, 222 Cal.App.4th at p. 1242.)"  The text of footnote 8 reads as follows:

> **8**    The special verdict form advocated by defense counsel had the effect of limiting the grounds upon which the jury *might* have permissibly

apportioned damages among the subject incident and prior accidents. Had the special verdict form asked the jury whether Mohammadi's current complaints were attributable, in whole or in part, to any of the prior accidents, the jury, *conceivably*, could have found they were. Except in limited circumstances not present here, a negligent defendant is not liable for preexisting injuries it did not cause regardless of whether those injuries were due to the negligence or fault of a third party. (See *Castellon v. U.S. Bancorp* (2013) 220 Cal.App.4th 994, 998 ["The elements of a negligence cause of action are the existence of a legal duty of care, breach of that duty, and *proximate cause* resulting in injury." (Italics added).) Alternatively, the jury could have concluded Mohammadi's current complaints were due to aggravation of a preexisting condition caused by the subject incident. "A tortfeasor may be held responsible where the effect of his negligence is to aggravate a preexisting condition …." (*Hastie v. Handeland* (1969) 274 Cal.App.2d 599, 604.)

3.  On page 28, the fourth full paragraph, beginning "Here, the special verdict", the word "needed" is deleted and replaced with "was asked" so the sentence now reads:

> Here, the special verdict form included a number of findings the jury was asked to make in order to apportion liability to other drivers in connection with the 2010 Texas incident, the 2014 tow truck incident, and the 2015 Porsche incident.

4.  On page 30, immediately before the Disposition, the following three paragraphs are added:

> In their petition for rehearing, defendants argue "[a]ll three of the previous accidents in which [Mohammadi] was involved are the sorts of incidents that generally don't occur in the absence of negligence, thus raising a presumption of negligence …." They further contend the presumption was not rebutted and, therefore, negligence was established as a matter of law. In support of these contentions, defendants cite to the following cases: *Beck v. Kessler* (1965) 235 Cal.App.2d 331; *Sweeney v. Pozarelli* (1965) 228 Cal.App.2d 585; and *Housel v. Pacific Electric Ry, Co.* (1914) 167 Cal. 245. Each of these cases involved application of the doctrine of res ipsa loquitur—a judicial doctrine affecting the burden of producing evidence. (*Beck*, at pp. 337–340; *Sweeney*, at pp. 591–592; *Housel* at pp. 247–250; Evid. Code § 646, subd. (b).)

2.

In the usual case, the doctrine is employed in situations where the person or entity alleged to be negligent—typically, a defendant—is a party to the lawsuit and available to offer rebuttal evidence if any exists. In that context, it is said "[t]he presumption arises when the evidence satisfies three conditions: ' "(1) the accident must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; [and] (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff." ' " (*Brown v. Poway Unified School. Dist.* (1993) 4 Cal.4th 820, 825–826.) Once these three conditions are met, the trier of fact is required to " 'assume the existence of the presumed fact' unless the defendant introduces evidence to the contrary." (*Id.* at p. 826.) If the defendant produces contrary evidence, the presumption disappears. (*Ibid.*)

Notably, defendants have not cited any case where the doctrine was employed to demonstrate the negligence of a non-party to the litigation. However, we need not pass on the propriety of such an application. Based on our review of the record, defendants never raised the res ipsa loquitur doctrine below, either during trial or in subsequent posttrial motion practice, and the jury was never instructed on the application of the doctrine. Generally, "issues not raised in the trial court cannot be raised for the first time on appeal." (*In re Estate of Westerman* (1968) 68 Cal.2d 267, 279.) Moreover, the doctrine was not raised on appeal in defendants' opening brief or reply brief. "Arguments cannot be raised for the first time in a petition for rehearing." (*Pacific Bell Wireless, LLC v. Public Utilities Com.* (2006) 140 Cal.App.4th 718, 746.)

There is no change in the judgment. Appellants' petition for rehearing filed on August 9, 2023, is denied.

FRANSON, Acting P. J.

WE CONCUR:

PEÑA, J.

SMITH, J.

3.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| REZA MOHAMMADI, Plaintiff and Respondent, v. CITY OF FRESNO et al., Defendants and Appellants. | F083633 (Super. Ct. No. 16CECG01808 ) **OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  D. Tyler Tharpe, Judge.

Manning & Kass, Ellrod, Ramirez, Trester, Scott Wm. Davenport and Steven J. Renick for Defendants and Appellants.

Jeremy M. Dobbins for Plaintiffs and Respondents.

-ooOoo-

Appellants/defendants City of Fresno (City) and Steven Wallace, a City employee, (collectively, defendants) appeal from a judgment on special verdict (judgment) entered against them and in favor of plaintiff/respondent Reza Mohammadi, and from the trial

court's ruling on defendants' motion for new trial and judgment notwithstanding the verdict (posttrial ruling) which the court denied.

We affirm the judgment and the trial court's posttrial ruling.

## FACTUAL AND PROCEDURAL BACKGROUND

On June 6, 2016, Mohammadi filed his original complaint against defendants for negligence in connection with a November 9, 2015, accident involving a City bus operated by Wallace in the course of his City employment and a vehicle operated by Mohammadi (the subject incident).

The original complaint was amended several times culminating in the operative third amended complaint, which alleged two negligence causes of action in connection to two separate accidents, the subject incident and an earlier, August 2015, accident involving a Porsche driven by defendant Larry Matson and the car in which Mohammadi and his son were travelling (the 2015 Porsche incident). The 2015 Porsche incident was resolved before trial and this action proceeded to trial on Mohammadi's claims against defendants.

Trial commenced in September 2021. Defendants admitted fault in connection with the subject incident. Thus, the issues to be determined at trial included (1) the total amount of Mohammadi's damages; (2) the percentage of fault to be attributed to defendants, if any, after taking into account the fault of others, if any; and (3) the amount of damages awarded, if any, against defendants.

Mohammadi had been involved in two additional motor vehicle accidents before the subject incident and 2015 Porsche incident—a January 2010 accident that occurred in Texas when Mohammadi and his spouse were driving on a congested highway and were struck from behind by a pickup truck (2010 Texas incident), and a January 2014 accident in which Mohammadi was in the waiting room of a medical office when a tow truck crashed through the office wall and caused him to be pushed into another office wall (2014 tow truck incident).

2.

In a special verdict, the jury found (1) defendants' negligence was a substantial factor in causing Mohammadi's harm; (2) total damages after the subject incident (without a reduction, if any, for damages resulting from prior incidents) were $175,000 for past noneconomic loss, and $900,000 for future noneconomic loss, for a total of $1,075,000; (3) the driver of the other vehicle in the 2010 Texas incident was not negligent; (4) the driver of the tow truck in the 2014 tow truck incident was not negligent; (5) the driver of the Porsche in the 2015 Porsche incident was not negligent; and (6) defendants were 100 percent responsible for Mohammadi's harm.

On October 5, 2021, the trial court entered judgment against defendants and in favor of Mohammadi in the amount of $1,075,000 with interest thereon at 10 percent until paid.

On November 5, 2021, defendants filed their notice of the motion for a new trial and for judgment notwithstanding the verdict (JNOV), and supporting papers for both. The grounds for the two posttrial motions were largely the same as those presented in this appeal.

In December 2021, the trial court issued its posttrial ruling denying both the motion for new trial and the JNOV motion. Defendants timely appealed the judgment and the posttrial ruling.

## DISCUSSION

I.    THE TRIAL COURT DID NOT ERR WITH REGARD TO DR. PAZOKI'S TESTIMONY

Defendants contend it was error for the court to allow Mohammadi's treating chiropractor, Nicole Pazoki, "to provide expert biomechanical testimony and opine regarding crash test videos which she obtained from the internet, even though she had not been designated as an expert in this area nor had any training in this area." Aside from making this contention, defendants provide no legal authority or further discussion in

3.

their opening brief to support these contentions. In their reply brief, defendants devote a single paragraph to these contentions, as follows:

> "Turning first to Nicole Pazoki, while it is beyond dispute that [Dr. Pazoki] was a treating chiropractor, this background does not give rise to the ability to provide expert biomechanical testimony, a wholly unrelated specialty which exceeds the scope of her training and experience. As the party proffering this testimony, this was Mohammadi's burden. See Evidence Code [section] 720."

The implied contention that Mohammadi was required to designate Dr. Pazoki as an expert in the field of biomechanics is unsupported by defendants. "If an argument in an appellate brief is supported by only an opinion or argument of appellant's counsel without 'citation to any recognized legal authority,' that argument may be deemed waived for failure to present supporting substantive legal analysis." (*In re A.C.* (2017) 13 Cal.App.5th 661, 672.) "It is not our place to comb the record seeking support for assertions parties fail to substantiate." (*Howard v. American National Fire Ins. Co.* (2010) 187 Cal.App.4th 498, 534.)

Nicole Pazoki, DC was disclosed by Mohammadi as a *nonretained* expert. Under Code of Civil Procedure section 2034.260, subdivision (b)(1), Mohammadi was required to provide "[a] list setting forth the name and address of a person whose expert opinion that party expects to offer in evidence at the trial." This was done. Subdivision (c) of said statute provides that, in the case of *retained* experts, additional disclosures are required including, without limitation, a "brief narrative statement of the qualifications of each expert" and a "brief narrative statement of the general substance of the testimony that the expert is expected to give." (Code Civ. Proc., §§ 2034.260, subd. (c)(1), (2), 2034.210, subd. (b).) Defendants do not provide legal authority to support their implied contention that Dr. Pazoki, as a nonretained expert, was subject to heightened disclosure requirements in addition to those imposed by Code of Civil Procedure section 2034.260, subdivision (b)(1). As a result, we deem the contention waived.

Similarly, defendants do not present on appeal any legal authority or cogent argument as to why Dr. Pazoki should not have been allowed to opine regarding "crash test videos which she obtained from the internet." " 'In order to demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record.' " (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 146.) We conclude defendants have forfeited any claim of error as to Dr. Pazoki's testimony concerning the crash test videos.

We now turn to defendants' contention that Dr. Pazoki had insufficient expertise to testify as to biomechanical issues. Evidence Code section 720 provides:

> "(a) A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates. Against the objection of a party, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert.

> "(b) A witness' special knowledge, skill, experience, training, or education may be shown by any otherwise admissible evidence, including his own testimony." (Evid. Code, § 720.)

" 'Whether a person qualifies as an expert in a particular case ... depends upon the facts of the case and the witness's qualifications.' [Citation.] '[T]he determinative issue in each case is whether the witness has sufficient skill or experience in the field so his testimony would be likely to assist the jury in the search for truth.' " (*Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102, 1115.)

"The trial court is given considerable latitude in determining the qualifications of an expert and its ruling will not be disturbed on appeal unless a manifest abuse of discretion [is] shown." (*People v. Singh* (1995) 37 Cal.App.4th 1343, 1377.) "The sufficiency of the showing of qualifications of a witness to testify as an expert is a matter resting largely in the discretion of the trial court, and its ruling will not be disturbed if there is any substantial evidence to support it." (*Humiston v. Hook* (1948) 86 Cal.App.2d 101, 105.)

5.

Here, the trial court conducted a hearing pursuant to Evidence Code section 402 (402 hearing) to determine whether Dr. Pazoki had the requisite qualifications of an expert on biomechanics. Dr. Pazoki testified she took an in-person course consisting of four modules in "Whiplash Injury: Biomechanics and Brain Traumatology." She continued, "[e]ach module is like a -- you would say 20 -- almost 24 hours." She further testified, "the whole principal of chiropractic is based on biomechanics. The forces apply to the body. What is the cervical region is [*sic*] going to do when a force is being applied, what is going -- the thoracic is going to do or the motion, whatever external motion or a blow to the spinal cord. These are all biomechanics." Dr. Pazoki also stated that, to a lesser extent, "we study biomechanics from the get-go when we go through chiropractic school" and explained how biomechanics relate to, and are used in, chiropractic treatments.

Defendants' categorical statements that biomechanics is a specialty "wholly unrelated" to chiropractic therapy, that Dr. Pazoki had no training in biomechanics, and that the field of biomechanics "exceeds the scope of [Dr. Pazoki's] training and experience" are not supported by the record on appeal. The evidence developed during the 402 hearing shows that Dr. Pazoki had nearly 96 hours of training in the subject (i.e., four modules at almost 24 hours each) and that the field is related to the chiropractic care Dr. Pazoki provides. Defendants provide no argument or authority to demonstrate that Dr. Pazoki's educational training is insufficient to qualify her as an expert in biomechanics based on the facts in this case. Consequently, we conclude the trial court did not abuse its discretion in denying defendants' motion in limine to preclude such testimony. Substantial evidence supports a determination Dr. Pazoki had sufficient qualifications to provide such testimony.

We also reject defendants' additional claim of error that Dr. Pazoki's trial testimony was prejudicial. However, defendants do not cite to any testimony of Dr. Pazoki before the jury which they contend should not have been admitted or was

6.

prejudicial. The mere fact that the trial court denied defendants' motion in limine to preclude portions of Pazoki's testimony does not demonstrate that her jury testimony was objectionable and prejudicial. It was defendants' burden to "affirmatively show prejudicial error." (*Scheenstra v. California Dairies, Inc.* (2013) 213 Cal.App.4th 370, 403, italics omitted.) Defendants have not carried their burden with respect to Dr. Pazoki's testimony.

## II. THE TRIAL COURT DID NOT ERR WITH REGARD TO JON SHIN'S TESTIMONY OR THE DEMONSTRATIVE EVIDENCE HE PREPARED

Defendants next contend the trial court erred with respect to the introduction of expert testimony over their objection by allowing Mohammadi's witness, Jon Shin, retained as an accident reconstruction expert, to testify concerning a computer generated animation he prepared to reconstruct the subject incident. Defendants argue the animation was without foundation and not tethered to the facts.

Defendants point to Mr. Shin's testimony during a 402 hearing that his animation did not take into account "the real world weight of the vehicles"; "was not to scale"; "did not take into account what biomechanics did"[1]; and "depicted a direct force animation despite the fact that the accident in question was not a bumper-to-bumper accident and, instead, caused a spinning rotation." They argue prejudice is demonstrated because "a video-graphic reconstruction is compelling evidence which is hard for a lay jury to disregard" and the prejudicial impact of the evidence outweighed its probative value. We disagree.

"A trial court's decision to admit … demonstrative evidence is reviewed for abuse of discretion." (*People v. Duenas* (2012) 55 Cal.4th 1, 21 (*Duenas*).) Moreover, "A trial court's decision to admit demonstrative evidence under section 352 will be upheld on

---

[1] We presume Defendants' contention that Mr. Shin's testimony "did not take into account what biomechanics did" is a reference to Mr. Shin's testimony that he did not work with a biomechanical engineer in developing the animation.

appeal unless the prejudicial effect of the evidence clearly outweighs its probative value." (*People v. Rivera* (2011) 201 Cal.App.4th 353, 362–363.) Such evidence " 'is admissible only where (1) the demonstration is relevant, (2) its conditions and those existing at the time of the alleged occurrence are shown to be substantially similar and (3) the evidence will not consume undue time or confuse or mislead the jury.' " (*Id.* at p. 363.)

"Courts and commentators draw a distinction between computer animations and computer simulations. [Citation.] 'Animation is merely used to illustrate … testimony while simulations contain scientific or physical principles requiring validation. [Citation.] Animations do not draw conclusions; they attempt to recreate a scene or process, thus they are treated like demonstrative aids. [Citation.] Computer simulations are created by entering data into computer models which analyze the data and reach a conclusion.' [Citations.] In other words, a computer animation is demonstrative evidence offered to help a jury understand … testimony or other substantive evidence [citation]; a computer simulation, by contrast, is itself substantive evidence." (*Duenas*, *supra*, 55 Cal.4th at p. 20.) "Courts have compared computer animations to classic forms of demonstrative evidence such as charts or diagrams that illustrate … testimony. [Citations.] A computer animation is admissible if ' "it is a fair and accurate representation of the evidence to which it relates...." ' " (*Ibid.*)

In determining the admissibility of the animation, the trial court stated, "there are certainly some deficiencies in its preparation. It's not the best evidence. I'm going to allow that to be shown to the jury, admitted into evidence, and the deficiencies can be argued to the jury as to the weight of the evidence." Defendants were advised by the court they could "augment and bring in [a] reconstructionist to point out the deficiencies in the video." However, the record on appeal does not include testimony from an animator or reconstructionist called by defendants.

The record on appeal does not contain *trial* testimony from Mr. Shin—only testimony from the 402 hearing. Thus, it appears defendants' argument goes to the

admission of the animation itself rather than the testimony of Mr. Shin. Notably, the animation itself was not designated as part of the record on appeal.

When Mr. Shin was asked at the 402 hearing how he made his calculations concerning "the speed or any angle of rotation or any rate of movement", he responded, "this is keyframe animation.[2] So, similar to traditional animation, a key point, the positions and rotations of the vehicles involved are placed, and the initial things that are fed into the computer are, of course, the speed of both the vehicles, and effort was made to try to match that as closely as possible to the known facts based on that video primarily, as well as the police report and the eyewitness accounts of what happened. And as far as individual angles, those were keyframed by hand. So, as in, you know, just placed there in an effort to make things look physically realistic, based on the principals of animation, action, reaction, and those kind of dynamic motions. So, not every single angle would be precisely what it actually was, of course, because there's limited data involved. But where possible, effort was made to match it to the known facts." When asked how he obtained "the scale for the individual vehicles," he responded "So, the vehicles were the purchased off the online marketplace. I also personally happen to drive a Corolla similar to the one involved in the case. So, I was able to check the measurements of [*sic*] lining up to real world measurements."

Mr. Shin testified that the City bus had "some cameras, as well as a record of the speed it was going at the time of the accident" and that he "gathered [information] from the video taken and produced" by defendants. He also considered photos and police

---

**2**      Oxford Reference defines "keyframe," as follows: "1. In animation, the drawings that define the start and end of an action: for example, if a figure raises their hand, the first keyframe would be the hand by the figure's side and the next would be the hand fully extended. Inbetween frames are frames that fill in all the points between. [¶] 2. In computer special effects, a set of programmable markers that define a point in a transition between two states so that the computer can generate inbetween frames: see also interpolation." (<https://www.oxfordreference.com/display/10.1093/oi/authority. 20110803100035299? rskey=cAjV0b&result=3> [as of Jun. 28, 2023])

reports in developing the animation. He was asked, "Do you know if the actual video of the accident is consistent with the animation—or what the animation depicts?" He responded, "Yes, to the extent that it can be. I mean the bus video shows the bus, you know, approaching and getting closer to the car. And so, after it was made to make it match as closely as possible, given that it's a different angle, and there are things seen in the animation that are not seen in the -- from the bus." Mr. Shin's 402 hearing testimony established the animation was not a computer simulation as described in *Duenas* and was intended to be demonstrative evidence that adhered to the known facts in the case.

Witness Andrey Grinko testified he was traveling southbound on freeway 41 in the middle lane at the time of the subject incident. The City bus was in the right hand lane some six or seven car lengths ahead of him. The driver of the City bus was drifting in and out of his lane, into the middle lane, and then toward the shoulder of the freeway. Mr. Grinko saw Mohammadi's car change lanes as if to exit on Shaw Avenue in Fresno and saw it "spinning out in front of the bus." He pulled over and noticed Mohammadi's car "was pretty beat up," that there was damage to the "driver's side quarter panel, rear quarter panel," that "the wheel was torn off," and that the side and front airbags had deployed.

Mr. Grinko was asked, "[n]ow, understanding that this is obviously not the actual bus and the actual car, it's a re[-]creation, it's an animation, is it still -- is it representative of the collision that you saw that night?" Mr. Grinko replied in the affirmative. He was asked, "[i]n what way?" to which he responded, "I remember seeing the -- the car get rear-ended similar in that fashion, and I specifically remember the car spinning out on the freeway." He was then asked, "would you say it's an accurate depiction of the accident from your perspective?" to which he replied, "Yes. Yeah."

Defendants do not cite any case law or other authority that requires demonstrative evidence be drawn to scale. "Even if *not* drawn to scale, [demonstrative evidence] may still be admissible as a graphic aid to testimony (e.g., a witness' drawing of an

10.

intersection). But the judge will need to caution the jury regarding this fact. It is opposing counsel's responsibility to ask (or remind) the judge to so inform the jury." (Wegner, et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2022) ¶ 4:66.) Defense counsel has not directed this court to any attempt on their part to request a cautionary instruction concerning the scale of the animation. No compelling argument has been made to suggest that differences between the animation's scale and the actual scale rendered the evidence misleading. Similarly, defendants do not cite any case law or other authority, and make no compelling argument, to suggest that the "real world weight of the vehicles" needed to be used, or that a biomechanical engineer needed to be consulted, in the preparation of the animation.

Most notably, Mr. Grinko indicated the animation was an accurate depiction of the subject incident from his perspective and stated Mohammadi's car was "rear-ended in a similar fashion" to that depicted in the animation.

The trial court did not abuse its discretion in admitting the animation. The animation was relevant and depicted the salient details of the accident from Mr. Grinko's perspective. Although defendants contend the animation was misleading and unduly prejudicial, they have not shown it to be either.

III. NO PREJUDICIAL ERROR HAS BEEN DEMONSTRATED WITH REGARD TO DR. BRICE'S TESTIMONY

Defendants contend the trial court erred by allowing Dr. Brian Brice, M.D., a physiatrist or physical medical rehabilitation specialist, to "improperly expand[] on his prior deposition testimony at trial" and by allowing Dr. Brice to provide "testimony which was not only hearsay and in violation of *People v. Sanchez* (2016) 63 Cal.4th 665 [(*Sanchez*)], but also contrary to a defense motion *in limine*." We disagree.

11.

A. *Defendants Failed to Demonstrate Dr. Brice Improperly Expanded on His Prior Deposition Testimony*

Defendants contend "Dr. Brice gave deposition testimony in which he specifically testified that he had formed the professional opinion that Mohammadi's injuries were cumulative in nature; however, at … trial, Dr. Brice recanted this testimony and testified that Mohammadi had fully recovered from any prior injuries in violation of the motion in limine." (Italics omitted.)

In trial testimony cited by defendants, Dr. Brice stated that, with respect to the 2014 tow truck incident, Mohammadi was "in a lot of pain afterwards"; "had multiple complaints that need[ed] to be checked out"; and those complaints "were thoroughly evaluated in the emergency room." With regard to the 2015 Porsche incident, Dr. Brice testified "there was a lot of stuff going on with regard[] to [Mohammadi's] complaints. And he -- I feel that he never really got better. I mean I feel like, you know he was in the process of rehabilitating his spine, and the last event [presumably a reference to the subject incident] actually made things a lot worse." Defendants objected on grounds this testimony violated their motion in limine No. 1 to prohibit "designated experts from offering opinions not disclosed at the time of their respective depositions."

The deposition testimony defendants contend demonstrates the trial testimony violated motion in limine No. 1 reads:

Q. "What are the opinions and conclusions you intend to opine in this matter?"

A. "Okay. Well, I intend to express that, you know, from the information that I was able to obtain and based on the evaluation of -- direct evaluation of the claimant that he sustained a serious injury that affected his spine, and that it was due to the motor vehicle crashes."

Q. "What motor vehicle accident?"

A. "My position is that it was cumulative. So, there were multiple motor vehicle accidents according to the records, and I feel as I read the records and the treatments that were provided to him, you know, his, once again,

12.

his medical trajectory was a synergistic[] effect whereby he was in one accident, and he had certain baseline of issues that were treated, and they sort of stabilized. And then he was in another accident, and seems thing to light up a bit, and he required an extensive amount of treatment which, you know, at some point stabilized and waxed and waned, and then he went into another accident which kind of lit things up again. And then he went through an extensive course of additional treatment that proved to not really get him back to a pre[-]accident condition."

We do not see any inconsistency between the cited deposition and trial testimony of Dr. Brice. The testimony does not support defendants' contention that Dr. Brice recanted his deposition testimony or that Dr. Brice testified Mohammadi had fully recovered from his prior injuries.

Defendants also cite to trial testimony in which Dr. Brice was asked to comment on a report provided by defense expert, Dr. Thomas E. Hoyt, M.D., a neurological surgeon. Defendants objected again based on their motion in limine number one and the objection was overruled. Dr. Brice then testified he felt Dr. Hoyt had difficulty obtaining "information … needed to construct … the basis of the injury" and Dr. Brice "didn't really see a—what [he] would consider a thorough spinal exam." He said Dr. Hoyt did a thorough medical records review and recounted some of Dr. Hoyt's medical findings. Dr. Brice testified that Dr. Hoyt "basically stated that the [subject incident] did not cause or affect in any way the patient's problems" which Dr. Brice felt was a hard determination to arrive at; that Dr. Hoyt was of the opinion that Mohammadi would have had to have undergone "all of the surgeries and all of the procedures that he underwent" even if the subject incident had not occurred; and that it was "impossible to really know that, because it did occur, and it was a serious accident." Dr. Brice said that Mohammadi "had serious complaints that required him to go to the emergency room following that accident"; that he might be able to accept Dr. Hoyt's opinion that the subject incident was not responsible for any of Mohammadi's complaints if it had been an "innocuous accident"; and that "on par with all the other accidents, you know, [the subject incident] was more serious because of the high speed velocity."

13.

Defendants also cite to testimony where Dr. Brice was asked to express an opinion on a report written by another of defendants' experts, Dr. Michael Robert Klein, Jr., an orthopedic surgeon.  This drew another objection by defense counsel based again on defendants' motion in limine No. 1, which the trial court overruled.  Dr. Brice then testified Dr. Klein did a "really good job of summarizing some of the conflicts that were occurring during the course of making surgical decisions" for Mohammadi.  Dr. Brice said he "took exception to [Dr. Klein's] comment that … Mohammadi was embellishing his symptoms, … and was a malingerer."  He was skeptical how a doctor could come to that conclusion based solely on a medical records review.

The above referenced testimony does not support the contention that Dr. Brice recanted his deposition testimony that Mohammadi's "injuries were cumulative in nature."  Nor does it support the contention that Dr. Brice testified Mohammadi had fully recovered from prior injuries.  Although defendants have contended, generally, that Dr. Brice was allowed to expand on his deposition testimony, they do not provide argument in support of the contention (aside from that already discussed).[3]  Assuming defendants contend the above testimony constituted such an expansion, they have not provided this court with an adequate record upon which to make such a determination.  No deposition testimony has been provided to the court (beyond that discussed above).  Absent an adequate record, any such contention by defendants must be resolved against them.  (*Hernandez v. California Hospital Medical Center* (2000) 78 Cal.App.4th 498, 502.)

---

[3]    At trial, and out of the presence of the jury, defense counsel told the court that in Dr. Brice's deposition "he was asked if he was going to do any additional work or express any additional opinions, and the only answer was he may opine on future treatment."  However, defendants' briefing on appeal does not discuss this contention.  Moreover, the deposition testimony defense counsel purportedly relied upon was not recited on the record before the trial court or included in the record on appeal, nor were deposition transcripts provided to the trial court or this court to assess the referenced question posed to Dr. Brice and his answer thereto.

We conclude the trial court did not err in overruling defendants' objections based on motion in limine No. 1.

*B.  Testimony in Violation of <u>Sanchez</u>, If Any, Was Not Prejudicial*

Defendants contend that certain testimony of Dr. Brice violated the holding in *Sanchez*, *supra*, 63 Cal.4th 665.  "In *Sanchez*, our Supreme Court clarified the limits on the extent to which an expert witness can relate and rely upon hearsay in support of an opinion, based upon the distinction between ' "case-specific hearsay" ' and hearsay which is 'part of the "general background information" acquired by the expert through out-of-court statements as part of the development of his or her expertise.' " (*People v. McVey* (2018) 24 Cal.App.5th 405, 416.)  "*Sanchez* defined case-specific facts as 'those relating to the particular events and participants alleged to have been involved in the case being tried,' and held that an expert is prohibited from testifying to such facts if they are outside the expert's personal knowledge and do not fall under an exception to the hearsay rule or have not been independently established by competent evidence." (*Ibid*., citing *Sanchez*, *supra*, 63 Cal.4th at pp. 676–677.)

Defendants contend the following testimony of Dr. Brice in response to the following question by plaintiff's counsel violated the holding in *Sanchez*:

> "Q.  Dr. Brice, you're familiar -- or in your record review, there's the two surgeries that we referenced, and then there's the October June -- or June 24th of 2020 surgery where a guide wire or a -- I'm sorry, a nerve stimulator was put into his spine.  And then it was removed a year later. So, of those four surgeries, do you feel that … Mohammadi had any benefit from those?

> "A.  Based on reading the records, there was a period of time that was reported by Dr. Paquette that indicated that he was doing better for a while, which, you know, preceded -- just make sure I'm speaking correctly here.  Okay.  So, that was conservative -- we call conservative management, we try to do the least amount of invasive procedures. The surgeries follow that when it was considered he failed those conservative measures, and he was still having a lot of pain and disability.

"The first surgery, once again, was minimally invasive. It was felt that that surgery didn't do its job. And the thought was that he had a condition called spinal stenosis,[4] which I mentioned earlier. And they were trying to open up the area to decrease the pressure. And it was apparent from the records that following that surgery, there was mild improvement over a period of time. And then things got worse again.

"And then they re-explored the next minimally invasive procedure, which was the implantation of a neurostimulator around the spinal cord to disrupt the pain signal going to the brain.

"And it usually happens in two steps. Generally, it happens first with a temporary implant where the nerve stimulator is placed in, and the actual machine is left outside the body, and we turn the stimulation to a certain level in order to decrease pain at the area of the spine. That's going to signal going to the brain that is sort of scrambled. And after a trial period, it's determined that if it worked or didn't work, a conclusion is made. And if it works, then a permanent implant is placed, and that -- that's a surgical procedure. And so, they have to put the machine under the skin in order to keep it safe and contained.

"That process apparently didn't work. There were lots of follow-up visits trying to adjust the machine. The wires that are on the spinal cord apparently moved. And he was not getting the relief … that he was expecting. And then based on the records, the patient made the decision that he wanted it removed.

"So, that was another surgical procedure where it had to be removed from beneath the skin, and the wires had to be extracted."

Following the above response, defense counsel objected on grounds of hearsay and that the testimony is not admissible under *Sanchez*, and moved to strike Dr. Brice's testimony "to the extent that he's relying on and reading the medical record." The trial court overruled the objection.

"[I]t is a fundamental principle of appellate procedure that a trial court judgment [or order] is ordinarily presumed to be correct and the burden is on an appellant to

---

**4**    "Spinal stenosis, a narrowing of the spaces in your spine, can compress your spinal cord and nerve roots exiting each vertebrae." (<https://my.clevelandclinic.org/health/diseases/17499-spinal-stenosis> [as of June 16, 2023].)

demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies [its] reversal ….” (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609; *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.)  To meet this burden, an appellant must provide the reviewing court with an adequate record (*Jameson*, at p. 609) and support each claim of error with argument and citations to the record (*Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 276–277).  In addition to demonstrating error, an appellant must also demonstrate that prejudice resulted from the error.  (*In re Marriage of McLaughlin* (2000) 82 Cal.App.4th 327, 337.)  A judgment may not be overturned “unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.”  (Cal. Const., art. VI, § 13.)

The record on appeal does not include the medical record Dr. Brice is alleged to have read from.  Nor have defendants indicated which portion of the above referenced testimony purportedly relied upon, or was read from, the medical record.  Without this information, the objection, which was expressly limited “to the extent [Dr. Brice was] relying on and reading the medical record,” is ambiguous.  Notwithstanding, we note the information contained in the testimony was largely testified to, without objection, by other witnesses (including Drs. Hoyt and Klein) or in other testimony by Dr. Brice.

Specifically, numerous witnesses (including, without limitation, Drs. Hoyt and Klein) testified to the number of surgeries Mohammadi underwent.  Both defense experts testified regarding the implantation of a neurostimulator and its subsequent removal.  Dr. Klein testified regarding Mohammadi’s treatment with epidural steroid injection(s), the narrowing of Mohammadi’s spinal disks, the discectomy Mohammadi underwent, and the return of Mohammadi’s pain as documented in medical records.  Dr. Pazoki discussed the transition from conservative care (e.g., physical therapy, pain management, epidural and similar injections) to surgical intervention in Mohammadi’s treatment, and the narrowing

17.

of Mohammadi's foramen.[5]  In other testimony, Dr. Brice said Mohammadi "had a degree of fairly moderate spinal stenosis."  In addition, Mohammadi, Mohammadi's son, and Mohammadi's spouse also testified regarding the number and type of surgical and nonsurgical treatments Mohammadi underwent and their ineffectiveness in resolving Mohammadi's pain.  Similarly, Mohammadi testified, without objection, he was told the reason his neurostimulator had ceased to eliminate or reduce his pain was that the wires had shifted.  Thus, the information disclosed in the challenged testimony of Dr. Brice was independently established and verified by other testimony.

Defendants contend the aforementioned testimony of Dr. Brice "impacted the jury's determination that Mohammadi's injuries [were] 100% attributable to the City of Fresno."  Yet, the record on appeal demonstrates the jury's determination in this regard was premised on the express findings that the drivers of the other vehicles in the 2010 Texas incident, 2014 tow truck incident, and 2015 Porsche incident, were not negligent and therefore, impliedly, not responsible for any harm to Mohammadi following the subject incident.  The jury was not asked to apportion liability on any other basis.

Assuming, without deciding, that the trial court erred in overruling defense counsel's *Sanchez* objection to Dr. Brice's testimony, the error was harmless.

IV.    THE TRIAL COURT DID NOT ERR IN ALLOWING MOHAMMADI'S ATTORNEY TO DISCUSS MOHAMMADI'S NATIONALITY AND RELATED EXPERIENCES DURING CLOSING ARGUMENTS

Defendants contend the trial court erred by allowing plaintiff's counsel to mention Mohammadi's nationality and related experiences during closing argument over defendants' objection.  They contend the following argument was "improper in its own right" and violated orders in limine sought by Mohammadi.

---

[5]    "Foraminal stenosis is narrowing that happens in certain places around the nerves that come out of [the] spinal cord.  It's a type of spinal stenosis …." (<https://my.clevelandclinic.org/health/diseases/24856-foraminal-stenosis> [as of July 6, 2023].)

"But I'd like to tell you a little bit about [Mohammadi's] life, and you can judge what kind of character he is.

"So, the testimony reflected that he and his wife and son came to the United States in 2007. They talked about that he came from Iran, and he was a mechanic there. So, is his family there is well-known. They are known as very radical, liberal family. Radical liberal in Iran means direct -- let me direct you to some of the things he testified about; that you split all the duties with your wife in the house. You should wash dishes together. You should cook together. You should clean together. All the duties of our home he believed they should do together. He believed that women should be allowed to drive; that she should be able to go to college; that everything should be able to worship to the dictate of their own heart.

"For these beliefs, his brother, who was more vocal than him, was thrown into an Iranian prison."

Defense counsel objected: "Your Honor, objection, motion in limine, and no evidence." The trial court overruled the objection. Mohammadi's counsel continued without further objection:

"His brother was thrown into an Iranian prison; and soon after, [Mohammadi] got word that he was going to be next unless he renounced the views that his brother held. He said, no, I will not. This is what we believe, and that's it.

"However, he had a young wife and young son, and he wasn't about to allow the things that might happen to them, that would be horrible, happen to them if he were to be thrown into prison. So, in the cold of night, they escaped Iran. And they fled to Turkey. For two years, they lived in the slum -- the worst slums that there are in Turkey. They lived there because he didn't have anything. They left everything in a pretty intense situation.

"After being there for two years of trying to come to the United States, and they weren't able to come, his brother was -- was killed in an Iranian prison because he wouldn't bend, he wouldn't renounce those beliefs.

"At that point, the United Nations be lobbied for [Mohammadi] and his family to come to the United States, and he was granted the ability to come here as a -- as a refugee. They came here, and they built a life here. And it was hard, as you heard."

19.

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion; and [¶] (b) The court which passes upon the effect of the error or errors is of the opinion that the admitted evidence should have been excluded on the ground stated and that the error or errors complained of resulted in a miscarriage of justice." (Evid. Code, § 353.)

Two initial points are worth comment. First, defense counsel's objection based on an unspecified motion in limine arguably does not meet the criteria of making "clear the specific … objection" relied upon.[6] (Evid. Code, § 353.) Notwithstanding, below we review defendants' contentions on the merits. Second, plaintiff's counsel's subsequent argument was not objected to and, to the extent it contained additional information not previously objected to, it may not form the basis of an appeal. (*Ibid.; Warner Constr. Corp. v. City of Los Angeles* (1970) 2 Cal.3d 285, 303.)

A. *Defendants Have Not Demonstrated Reversible Error in Connection With Any Alleged Violation of Orders in Limine*

On appeal, defendants assert the argument violated the court's orders granting motions in limine Nos. 6 and 7. Motion in limine No. 6 sought to preclude "[m]ention of any lawsuits in which plaintiff or plaintiff's family were named as a party [versus] the Islamic Republic of Iran." Motion in limine No. 7 sought to preclude "mention of the plaintiff[']s or any witness['] national origin or any questions that [elicit] a response where the plaintiff or any witness must respond that they are from Iran or any other middle eastern country."

---

[6] The record on appeal contains 21 motions in limine.

20.

Counsel's statements during closing argument did not reference a lawsuit between Mohammadi or his family members against the Islamic Republic of Iran. Thus, there was no violation of the order granting motion in limine No. 6.

With regard to the order granting motion in limine No. 7, the record on appeal demonstrates that both defense counsel and plaintiff's counsel mentioned, or elicited testimony concerning Mohammadi's nationality in front of the jury. For example, defense counsel read from Mohammadi's deposition in which he was questioned about complaints he had concerning "things that happened back in Iran"—i.e., "a flood that's taking over Iran." Defense counsel read from Mohammadi's deposition testimony wherein he stated, "We Iranians, the men works [*sic*]." Similarly, Mohammadi testified, without objection that "in Iran, [he] had a very nice mechanic shop, and [his] dream was to do the same here." In addition, Mohammadi's spouse testified, without objection, that she and Mohammadi "had a tough life as refugee[s]."

Thus, defense counsel, herself, elicited testimony concerning Mohammadi's nationality and any alleged error in that regard was invited through her own questioning. (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403 [" 'Where a party by his conduct induces the commission of error, he [or she] is estopped from asserting it as a ground for reversal' on appeal."]).

We conclude defendants have not demonstrated reversible error in connection with any alleged violation of orders granting motions in limine Nos. 6 and 7.

B.     *Defendants Have Not Demonstrated Reversible Error in Connection With Any Alleged Reference to Matters Outside the Evidence*

An appellate court will affirm a judgment unless it concludes "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836; *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800.) Our state high court has " 'made clear that

a "probability" in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*.' " (*Cassim*, at p. 800.)

As demonstrated above, evidence was introduced showing Mohammadi and his family were from Iran and that they were refugees. In addition, Mohammadi's son testified his uncle (presumably, Mohammadi's brother or brother-in-law) was killed by the Iranian government. There was also testimony that Mohammadi was committed to helping his wife with household chores and duties (e.g., cooking, cleaning, vacuuming, washing dishes), that he "was known for how much [he] helped [his] wife" and that he "really fe[lt] that [he] should always be helpful to her." Although plaintiff's counsel embellished these details somewhat by noting that the family had fled to Turkey, that Mohammadi's brother was in prison when, as Mohammadi's son testified, he was killed by the Iranian government, and that Mohammadi's commitment to helping his wife with chores was radically liberal in the eyes of the Iranian government, we cannot say that these added details caused prejudice in the eyes of the jury. The salient details—i.e., their Iranian nationality, their refugee status, Mohammadi's brother's death at the hands of the Iranian government, and Mohammadi's commitment to helping his wife with household chores were already before the jury. Moreover, it is common knowledge that the government of Iran takes a different view of the rights of women and considers them subservient to men. An attorney may reference during closing argument "matters not in evidence that are common knowledge, or are illustrations drawn from common experience, history, or literature." (*People v. Sandoval* (1992) 4 Cal.4th 155, 193.)

We conclude there is no reasonable chance defendants would have obtained a more favorable verdict in the absence of that portion of the closing argument defendants have objected to. The main details were already presented to the jury either by defense counsel, or without objection from defense counsel. No prejudicial error has been shown.

22.

V.     SUBSTANTIAL EVIDENCE SUPPORTS THE DAMAGES AWARD

Defendants contend sufficient evidence does not support Mohammadi's $1,075,000 noneconomic damage award.  We disagree.

A.     *Substantial Evidence Supported the Jury's Determination of Total Damages*

The jury found that defendants' negligence was a substantial factor in causing harm to Mohammadi.  Defendants do not challenge this finding on appeal.  On the issue of damages, the jury was provided with a special verdict form that requested the jury answer the following question:  "What are … Mohammadi's total damages after November 9, 2015?  Do not reduce the damages based on the fault, if any, of … Mohammadi or others."  In response, the jury found Mohammadi's past noneconomic loss was $175,000 and future noneconomic loss was $900,000, for a total of $1,075,000.

Civil Code section 1431.2 defines "non-economic damages" as "subjective, non-monetary losses including, *but not limited to*, pain, suffering, inconvenience, mental suffering, emotional distress, loss of society and companionship, loss of consortium, injury to reputation and humiliation."  (Civ. Code, § 1431.2, subd (b)(2).)  The special verdict form defined "noneconomic loss" as including "physical pain, mental suffering, loss of enjoyment of life, disfigurement, physical impairment, inconvenience, grief, anxiety, humiliation, [and] emotional distress."

" 'There are no fixed or absolute standards by which an appellate court can measure in monetary terms the extent of the damages suffered by a plaintiff as a result of the wrongful act of the defendant.  The duty of an appellate court is to uphold the jury and trial judge whenever possible.  [Citation.]  The amount to be awarded is "a matter on which there legitimately may be a wide difference of opinion" [citation].' " (*Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 299 (*Bigler-Engler*).)

"The difficulty inherent in assessing damages is plainly evident when noneconomic damages such as pain and suffering are at issue:  ' "One of the most

23.

difficult tasks imposed upon a jury in deciding a case involving personal injuries is to determine the amount of money the plaintiff is to be awarded as compensation for pain and suffering.  No method is available to the jury by which it can objectively evaluate such damages, and no witness may express his subjective opinion on the matter. [Citation.]  In a very real sense, the jury is asked to evaluate in terms of money a detriment for which monetary compensation cannot be ascertained with any demonstrable accuracy." ' [Citations.]  Moreover, '[n]oneconomic damages do not consist of only emotional distress and pain and suffering.  They also consist of such items as invasion of a person's bodily integrity (i.e., the fact of the injury itself), disfigurement, disability, impaired enjoyment of life, susceptibility to future harm or injury, and a shortened life expectancy.' " (*Bigler-Engler*, *supra*, 7 Cal.App.5th at p. 300.)

"The measure of damages suffered is a factual question and as such is a subject particularly within the province of the trier of fact….  [W]e adhere to the previously announced and historically honored standard of reversing as excessive only those judgments which the entire record, when viewed most favorably to the judgment, indicates were rendered as the result of passion and prejudice on the part of the jurors." (*Phipps v. Copeland Corp. LLC* (2021) 64 Cal.App.5th 319, 344.)

" 'A party who challenges the sufficiency of the evidence to support a particular finding must *summarize the evidence on that point, favorable and unfavorable, and show how and why it is insufficient*.  [Citation.]' [Citation.]  Where a party presents only facts and inferences favorable to his or her position, 'the contention that the findings are not supported by substantial evidence may be deemed waived.' " (*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 738 (*Schmidlin*).)

Defendants' brief provides a summary of evidence favorable to *its own* argument including medical expert testimony regarding injuries and treatment following the 2010 Texas incident, the 2014 tow truck incident, and the 2015 Porsche incident; and *sub rosa* video evidence it contends shows Mohammadi "smiling, laughing, and behaving in a

manner … contrary to the testimony at trial." Omitted from defendants' brief, however, is a discussion of the evidence showing Mohammadi's injuries and treatment from the subject incident. Defendants do not discuss testimony from Mohammadi or others that he suffered extreme pain which interferes with his activities of daily living and his frequent inability to do the most menial of tasks (e.g., showering, using the facilities, cleaning, washing dishes, etc.) without assistance or debilitating pain; that Mohammadi's injuries have had an adverse impact on his social life, have made him irritable, agitated, and impatient, and have caused him sadness, distress and depression; that Mohammadi finds it difficult to sleep and has frequent nightmares; that Mohammadi suffered from "muscle spasm, leg weakness, headache, [and] anxiety"; that Mohammadi's pain was such that he underwent physical therapy, received numerous injections, and underwent a series of surgeries to alleviate his pain; or that, as a result of his debilitation, his relationship with his wife suffered to the point where they had to sleep in separate beds or the contention that his debilitation is a reason his wife filed for divorce. As the trial court noted in its ruling on the posttrial motions, testimony from a plaintiff and family members is sufficient in this case to support a claim for noneconomic damages.

On this record, we cannot conclude the jury's determination of total damages was unsupported by substantial evidence or the product of passion or prejudice. Moreover, defendants' failure to summarize evidence favorable to the judgment waived their contention that substantial evidence does not support the determination. (*Schmidlin*, *supra*, 157 Cal.App.4th 728, 738.) Accordingly, we uphold the jury's determination of total damages.

      B.    *The Verdict Form Request for Special Findings on the Comparative Fault of Other Non-Parties was Not Error*

Defendants argue CACI No. 406 does not require that a defendant bear the burden of establishing that a third-party was *negligent*. Rather, the instruction may be properly modified such that a finding is based on either negligence *or fault*, and it was error for the

25.

trial court to not have sua sponte included this modification in the verdict form submitted to the jury, citing *Lysick v. Walcom* (1968) 258 Cal.App.2d 136, 157–158. We disagree.

In response, Mohammadi argues defense counsel "advocated and pushed" for the use of CACI No. 406 with specific wording of negligence to be used, and therefore any alleged error was invited by defendants. This contention is confirmed by comments of the trial court during the hearing on defendants' posttrial motions.[7] Notably, defendants did not make this sua sponte duty argument to the trial court in their posttrial motions.

CACI No. 406, as presented to the jury, was a correct statement of the law on determining the comparative fault of other non-parties to a plaintiff's injuries and damages. There is no evidence in the record that defendants objected to CACI No. 406 as given. The special verdict form, which defendants supported, incorporated this instruction. At trial defendants argued that trial evidence supported a finding of negligence by the non-parties. Mohammadi's counsel argued there was no such evidence. The trial court's statements during the posttrial hearing confirmed the lack of evidence to support the other drivers' negligence, and suggested other reasons for the prior accidents. If defendants had proven to the jury's satisfaction that those other drivers' negligence contributed to Mohammadi's harm, defendants would have been

---

**7** The trial court stated that CACI No. 406 *"was requested by the defense"* (italics added) and then asked defense counsel whether any evidence of negligence on the part of the other drivers was presented to the jury. In response, defense counsel stated, "I think that there can be an attribution made by the defendants' status as to where the damages arose from. It's often the case that an individual is able to point to one of the defendants or openly share some other alternative cause. That's not my understanding of the law, that we're required to present evidence regarding the forces or actions rather than where the harm has been caused by." In response, the court stated, "that's *the verdict form that the defendants advocated and pushed to be given to the jury, specific findings, I think it was questions 3, 5 and 7, that those other drivers were negligent.* In [CACI No.] 406, *advocated by the defense*, where the defense undertook … the obligation on a burden of proof had to convince the jury that those other drivers were negligent." (Italics added.)

26.

entitled to a reduced share of liability. (See *Sagadin v. Ripper* (1985) 175 Cal.App.3d 1141, 1167.)

Moreover, our state high court has stated, " ' " 'In a civil case, each of the parties must propose complete and comprehensive instructions in accordance with his [or her] theory of the litigation; if the parties do not do so, the court has no duty to instruct on its own motion.' " ' " (*Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1130–1131; *Starrh & Starrh Cotton Growers v. Aera Energy* (2007) 153 Cal.App.4th 583, 601 [5th Dist. Ct. App.]; *Moreno v. Bassi* (2021) 65 Cal.App.5th 244, 263 [5th Dist. Ct. App.]; *West v. Johnson & Johnson Products, Inc.* (1985) 174 Cal.App.3d 831, 864 [6th Dist. Ct. App.].)

Based on the record on appeal and in the absence of any evidence to the contrary, we conclude defendants requested the special verdict form that was given (see *Regalado v. Callaghan* (2016) 3 Cal.App.5th 582, 593) and that, to the extent defendants contend this was error, it was invited by them.

In addition, defendants did not object to the special verdict form before the jury was discharged. " ' "Failure to object to a verdict before the discharge of a jury and to request clarification or further deliberation precludes a party from later questioning the validity of that verdict if the alleged defect was apparent at the time the verdict was rendered and could have been corrected." [Citation.]' [Citation.] 'The obvious purpose for requiring an objection to a defective verdict before a jury is discharged is to provide it an opportunity to cure the defect by further deliberation. [Citation.]' [Citation.] 'The rule is designed to advance efficiency and deter gamesmanship.' " (*Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1242, italics omitted (*Taylor*).)

Once the jury's findings in the special verdict form were made known to defendants and defense counsel, they were on notice that the jury had not found the drivers in the pre-subject incidents to be negligent. If defendants believed the special verdict form should have also asked the jury to determine the *non-negligent* fault of

27.

others as a basis for comparative liability, it was incumbent upon them to seek modification of the special verdict form and to do so before the jury was discharged. (*Taylor*, *supra*, 222 Cal.App.4th at p. 1242.)  They did not do so, even in their posttrial motion for a new trial.  A "trial court has no duty to instruct on its own motion, nor is it obligated to modify proposed instructions to make them complete or correct." (*Maureen K. v. Tuschka* (2013) 215 Cal.App.4th 519, 526.)

We conclude the trial court did not err in submitting the special verdict form, as urged by defendants, to the jury.  To the extent defendants contend it was error, it was invited by them and they have waived the right to appeal the issue.

C.      *Sufficient Evidence Supports the Jury's Finding of No Apportionment Based on Comparative Liability*

We now turn to defendant's contention that insufficient evidence supported the jury's finding of no apportionment based on comparative liability.

It was defendants' burden to prove by a preponderance of evidence that " 'some nonzero percentage of fault is properly attributed to the plaintiff, other defendants, or nonparties to the action.' " (*Phipps v Copeland Corp. LLC, supra,* 64 Cal.App.5th at p. 332.)  " '[W]here the issue on appeal turns on a failure of proof at trial [to sustain a burden of proof], the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.  [Citations.]  Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' " (*Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 466.)

Here, the special verdict form included a number of findings the jury needed to make in order to apportion liability to other drivers in connection with the 2010 Texas incident, the 2014 tow truck incident, and the 2015 Porsche incident.  Those questions read, as follows:  "3.  Was the driver in the 2010 [Texas incident] negligent?"; "5.  Was

28.

the driver in the 2014 [tow truck incident] negligent?"; and "7.  Was the driver [in] the [2015 Porsche incident] negligent?"  The jury answered "no" to each of these questions.  Upon answering "no" to each of the foregoing questions, the jury was then instructed to "insert the number zero" next to the corresponding driver in question 9 of the special verdict form.  As a result, question 9, as drafted and as completed by the jury read, as follows:

> "9.  What percentage of responsibility for … Mohammadi's harm after November 9, 2015, do you assign to the following?  Insert a percentage for City of Fresno and only those who received "yes" answers in questions 3, 5 or 7:

> "City of Fresno                                                    100%

> "2010 [Texas incident] [d]river                              0%

> "2014 [t]ow [t]ruck [incident] [d]river                  0%

> "The driver [in] the [2015] Porsche [incident]      0%

> "TOTAL:                                                              100%"

The question we must therefore answer is whether, as a matter of law, a different percentage of apportionment is required for any of the drivers in the 2010 Texas incident, 2014 tow truck incident, or the 2015 Porsche incident.

On appeal, defendants rely on the following facts to demonstrate negligence on the part of the other drivers:  (1) the 2010 Texas incident involved a rear-end collision with Mohammadi's vehicle; (2) the 2014 tow truck incident involved a tow truck "ramm[ing] through a building and pinn[ing] Mohammadi to a wall"; and (3) the 2015 Porsche incident involved a car that "came out of nowhere at a speed of 30 to 35 mph" and side-swiped Mohammadi's vehicle.

The evidence defendants point to does not demonstrate negligence, as a matter of law, on the part of the other drivers.  As the trial court suggested, those accidents may have been caused by other factors other than the negligence of the other drivers (e.g., a

29.

medical emergency, a blown tire, or a non-negligent collision with a third vehicle).  As a result, we cannot say that any of those drivers were negligent as a matter of law.

## DISPOSITION

The judgment and the trial court's posttrial ruling are affirmed in their entirety. Costs on appeal are awarded to plaintiff and respondent Mohammadi.


FRANSON, Acting P. J.

WE CONCUR:


PEÑA, J.


SMITH, J.